**YONKERS RACING CORPORATION and St. Joseph's Seminary and College, Petitioners–Appellants,**

v.

**CITY OF YONKERS, Respondent–Appellee,**

and

**United States of America and Yonkers Branch, NAACP, et al., Intervenors–Appellees.**

**Nos. 1504, 1505, Dockets 88–6140, 88–6146.**

United States Court of Appeals, Second Circuit.

Argued July 20, 1988.

Decided Sept. 22, 1988.

Robert D. Meade and Michael J. Trainor, White Plains, N.Y. (Bleakley & Schmidt, White Plains, N.Y., of counsel), for petitioners-appellants.

Michael W. Sculnick, New York City (Stanley R. Strauss, Vedder, Price, Kaufman, Kammholz & Day, New York City, Paul W. Pickelle, Corp. Counsel, City of Yonkers, Yonkers, N.Y., Rex E. Lee, Carter G. Phillips, Mark D. Hopson, Gary I. Resnick, Sidley & Austin, Washington, D.C., of counsel), for respondent-appellee.

Linda F. Thome, Atty., U.S. Dept. of Justice, Washington, D.C. (Wm. Bradford Reynolds, Asst. Atty. Gen., David K. Flynn, Atty., Dept. of Justice, Washington, D.C., of counsel), for intervenor U.S.

Michael H. Sussman, Counsel, Yonkers Branch, NAACP, Yonkers, N.Y. (Sussman & Sussman, Yonkers, N.Y., of counsel), for intervenors Yonkers Branch, NAACP, et al.

Before ALTIMARI and MAHONEY, Circuit Judges, and KORMAN, District Judge.*

ALTIMARI, Circuit Judge:

These two separate appeals, which we have consolidated for purposes of this opinion, follow from the housing remedy portions of a prior judgment, entered in the

---

* The Honorable Edward R. Korman, United States District Court for the Eastern District of New York, sitting by designation.

United States District Court for the Southern District of New York (Sand, J.), finding the City of Yonkers (the "City" or "Yonkers") liable for a pattern and practice over a span of forty years of deliberately concentrating federally subsidized low income housing in the southwest quadrant of Yonkers in order to maintain racial segregation, and ordering Yonkers, *inter alia,* to provide sites for 200 units of public housing in nonminority areas of the city. *United States v. Yonkers Bd. of Educ.,* 624 F.Supp. 1276 (S.D.N.Y.1985), and Housing Remedy Order, 635 F.Supp. 1577 (S.D. N.Y.1986), *aff'd,* 837 F.2d 1181 (2d Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

This case concerns the consent decree ("Consent Decree") reached between the City of Yonkers, the United States and the Yonkers chapter of the National Association for the Advancement of Colored People (NAACP) designating 7 public housing sites for 200 units of housing east of the Saw Mill River Parkway. Two of these sites currently are owned by petitioners-appellants Yonkers Racing Corporation (the "Raceway") and St. Joseph's Seminary and College (the "Seminary"), respectively. Pursuant to the terms of the Consent Decree approved by the Yonkers city council (the "City Council") and entered by the district court on January 28, 1988, the City initiated, under pain of contempt, condemnation proceedings in state court against the Raceway and Seminary sites. Thereafter, the Raceway and the Seminary filed separate petitions against the City in the Supreme Court of the State of New York, Westchester County, pursuant to Article 78 of the New York Civil Practice Law and Rules (CPLR), seeking to enjoin the condemnation of their respective properties. On May 27, 1988, Judge Sand ordered the City of Yonkers to remove the Article 78 proceedings to the district court.

The Raceway and the Seminary appeal from an order denying their motions to remand the Article 78 proceedings back to state court and from an order dismissing their Article 78 petitions on the merits. The district court held that removal was authorized under the federal removal stat-utes, 28 U.S.C. §§ 1441, 1443, and the All Writs Act, 28 U.S.C. § 1651. In addition, the court determined that the extraordinary nature of the proceedings warranted application of statutory exemptions from the notice, hearing and review requirements of the New York Eminent Domain Procedure Law (EDPL) and from the provisions of the State Environmental Quality Review Act (SEQRA). The district court also found that, even if such exemptions did not apply, there was such substantial compliance with the notice, hearing and review provisions of state law that petitioners' statutory rights were not violated. Finally, the district court considered the Seminary's first and fourteenth amendment free exercise challenge to the taking of its property and held that, since the inclusion of the Seminary's property was an integral part of the Consent Decree and thus essential to efforts designed to remedy racial segregation in housing, no valid claim for a violation of the first amendment had been advanced.

On appeal, the Raceway and the Seminary principally contend that removal was improper under the federal removal statutes and the All Writs Act since only a defendant is permitted to remove and the City of Yonkers was a plaintiff, not a defendant, in the underlying condemnation proceedings. Petitioners further contend that not only are the exemptions to the EDPL and SEQRA inapplicable but that full compliance with the notice, hearing and review provisions of the statutes is required. The Seminary separately argues that the district court erred in rejecting its free exercise defense to the condemnation of its property without the benefit of a hearing to determine whether other reasonable alternatives exist to the taking of religiously owned and used property.

For the reasons that follow, we affirm the district court's order denying petitioners' motions to remand for lack of federal removal jurisdiction, but solely on the authority of the All Writs Act. We also affirm the court's order dismissing the Article 78 petitions in all respects except with regard to the Seminary's first amendment

challenge to the taking of its property which is remanded to the district court for further consideration.

## BACKGROUND

The underlying facts of the Yonkers litigation are set forth in exhaustive fashion in Judge Kearse's recent opinion affirming the district court's finding of liability against the City under both Title VIII of the Civil Rights Act of 1968 (the "Fair Housing Act"), 42 U.S.C. § 3601 *et seq.*, and the equal protection clause of the fourteenth amendment, and therefore need not be restated here. For our purposes, it suffices simply to emphasize that this court concluded, as did Judge Sand, that " 'the extreme concentration of subsidized housing that exists in Southwest Yonkers today is the result of a pattern and practice of racial discrimination by City officials, pursued in response to constituent pressures[,] to select or support only sites that would preserve existing patterns of racial segregation, and to reject or oppose sites that would threaten existing patterns of segregation.' " 837 F.2d at 1194 (quoting 624 F.Supp. at 1373).

To remedy the statutory and constitutional violations, the district court in part ordered the City to fulfill its preexisting commitment with the Department of Housing and Urban Development (HUD) to provide sites for 200 units of public housing east of the Saw Mill River Parkway funded by HUD's Community Development Block Grant program. 635 F.Supp. at 1580. Following this court's affirmance of the housing remedy order, the City, in January 1988, entered into extensive negotiations with the Department of Justice and the NAACP concerning compliance by the City with its obligation under the Housing Remedy Order to designate public housing sites. Under threat of contempt sanctions by the district court for noncompliance with the Housing Remedy Order, the City eventually reached an agreement with the Department of Justice and the NAACP designating 7 sites on which to build a total of 200 units of public housing. The agreement was incorporated into the Consent Decree which required the City to initiate eminent domain proceedings, if necessary, to acquire these sites within 60 days. As part of the Consent Decree, HUD was to review and approve the housing sites while the City was in the process of acquiring title to the 4 designated properties which were privately owned. Within 80 days of the entry of the decree, final HUD approval was to have been obtained and the City was to have solicited proposals from developers for construction of the housing.

Two of the privately owned properties included the Raceway site, a 1.2–acre parcel now used as a parking lot and currently slated for 24 units of housing, and the Seminary site, a 2–acre parcel on the border of the Seminary's 44–acre property and also currently slated for 24 units of housing. On January 25, 1988—the date that the City reached agreement with the United States on the Consent Decree—the Roman Catholic Archdiocese of New York on behalf of the Seminary issued a statement concerning the designation of the Seminary site:

> The Archdiocese of New York has been informed that there has been a recent decision to build units of affordable housing upon property now belonging to the Archdiocesan Major Seminary, Saint Joseph's, in the Dunwoodie section of Yonkers. Since it has been decided to proceed with these plans, the Archdiocese will do everything possible to promote the success of the effort....

Advised of the Cardinal's intent to facilitate the construction of public housing on the Seminary site, Judge Sand welcomed the Church's participation and support. A month later, the City of Yonkers, pursuant to the terms of the Consent Decree, made offers of purchase to the owners of each privately owned site; the Archdiocese rejected the City's offer on March 18, 1988. On March 21, John Cardinal O'Connor wrote to Judge Sand stating that while the Archdiocese supported the addition of public housing in Yonkers, it believed there were "serious problems in the current plan." Cardinal O'Connor expressed concern that four of the seven housing sites

would be located in one parish in southeast Yonkers. The Cardinal also objected to the public perception that he had "volunteer[ed]" the Seminary site. His Eminence explained that he had decided in January to "'yield graciously'" to the City, apparently believing (albeit erroneously, as it later became apparent) that the Seminary site would be condemned with or without his consent.

The district court responded by suggesting that the City and the Archdiocese consider substituting an alternate site in place of the Seminary property. In the interim, the court ordered the City of Yonkers to initiate eminent domain proceedings against the Seminary as well as against the Raceway, which also had rejected the City's offer to purchase its property. On April 24, 1988, two days after the City filed condemnation petitions in state court, the Cardinal declared that the Consent Decree was "fatally flawed." In addition, he said he was "deeply resentful" of the process which led to the condemnation action and which put the Archdiocese in the "humiliating position" of being perceived as "so resistant to making the property available that the court had to require the city to condemn the property."

The City of Yonkers then attempted to vacate the Consent Decree on the basis of a "mutual mistake" between the City Council and the Archdiocese. In support of its motion to vacate under Fed.R.Civ.P. 60(b) dated May 2, 1988, the City argued that the Cardinal's endorsement of the Consent Decree and his willingness to sell the Seminary site had been essential to the City's approval of the decree—the support of the Catholic Church being critical in order to achieve acceptance of the housing plan by the City's residents, a substantial proportion of whom are Catholic. At oral argument on the motion to vacate, the district court determined that while the Cardinal's support for the Consent Decree had been a "welcome occurrence," it had not been so crucial that his subsequent withdrawal of support was sufficient to invalidate the decree. In any event, the court noted that, even assuming there had been a mistake, the proper course of action for the City was simply to propose a modification of the Consent Decree designating an alternative to the Seminary site. Judge Sand thereupon directed the City to meet with the Archdiocese to see if some accommodation could be reached.

Meanwhile, the Seminary and the Raceway filed answers with affirmative defenses to the condemnation petitions, and on May 11, 1988, instituted Article 78 proceedings against the City claiming that the proposed condemnations were "null and void." The parties also sought injunctive relief preventing the City from acquiring the two sites. By the end of May, once it became clear that the City and the Archdiocese had failed to reach any agreement regarding the designation of an alternate housing site and that the City Council would not propose any modification of the Consent Decree, the United States filed an order to show cause in the district court seeking removal of the Article 78 proceedings from state court. On May 27, 1988, the district court granted the order directing the City to remove the Article 78 proceedings to federal court and permitted the United States and the NAACP, plaintiffs in the underlying civil rights litigation, to intervene as respondents.

In ordering removal of the Article 78 proceedings, the district court explained:

> During the informal discussions which preceded entry of the consent decree, the question was raised whether [the] condemnation proceedings should be commenced in [the district] court or in state court. It was then the understanding of the parties that the sole issue which would be present in the condemnation proceedings related to value, that is, the amount to be paid to the property owner whose land was condemned by the City of Yonkers in implementation of the housing remedy order. It was with that understanding and intention that the consent decree did not contain a provision requiring that the condemnation proceedings go forward in [the district] court....

Judge Sand also found a "significant risk" if removal were not ordered that the City

of Yonkers "[would] be confronted with inconsistent orders from two courts [—] ... an order of [the district] court to proceed with the condemnation of the two properties, and an order of [the] state court either not to proceed with that condemnation or to proceed pursuant to [procedures] and a timetable ... inconsistent with [that] established by [the district] court." While the All Writs Act was, according to Judge Sand, to be invoked only as a "last resort," the court determined that, rather than allow the parties to go forward in state court knowing full well that there would be resort to the district court for injunctive relief against the implementation of any state court order inconsistent with the Consent Decree, the "more appropriate procedure" was for the district court to exercise removal jurisdiction over the Article 78 proceedings in the first instance. In sum, the court characterized the Article 78 proceedings as a "classic case" for invocation of the All Writs Act to effectuate removal.

Following removal, petitioners filed motions to remand the Article 78 proceedings to state court. On June 8, 1988, the district court heard argument from counsel on the motions to remand, the merits of the Article 78 proceedings and the City's motion to vacate the Consent Decree. With regard to the motions to remand, the court held that removal was authorized under the general federal removal statute, 28 U.S.C. § 1441, the civil rights removal statute, 28 U.S.C. § 1443, and the All Writs Act. The court further stated that removal was appropriate because the petitioners' defenses to the condemnations were best litigated in federal court with the benefit of an existing record, that removal would not deprive petitioners of their right to be heard on the merits of their Article 78 petitions, and that removal would eliminate the possibility of inconsistent orders from two courts.

On the merits of the Article 78 petitions, the district court concluded that the "emergency situation" provision of section 206(D) of the EDPL applied in the instant case to exempt the City of Yonkers from compli-

ance with the notice, hearing and review requirements of the statute, and that the proposed condemnations were exempt from SEQRA pursuant to the court order provisions of SEQRA's implementing regulations. 6 NYCRR § 617.2(q). Moreover, according to the district court, the process by which the public housing sites were designated and reviewed constituted substantial compliance with the purposes of the notice, hearing and review requirements of state law.

As for the Seminary's free exercise challenge, the district court indicated that aside from the issue of the validity of the Seminary's claim of a protectible religious purpose for the two-acre site under the first amendment, the alleged interference with the pastoral contemplative atmosphere of the only seminary in the Archdiocese had to be balanced against the need to vindicate the federal constitutional rights of those citizens of Yonkers who have been denied fair housing. In striking the balance in favor of vindication of fair housing rights, the court found the inclusion of the Seminary site in the Consent Decree to be essential.

Accordingly, the district court denied petitioners' motions to remand and the City's motion to vacate the Consent Decree,[1] dismissed the Article 78 petitions, and ordered the Seminary and the Raceway to "present to [the state c]ourt a proposed order stating that, insofar as all substantive grounds for objection to the proceedings in question have been ... resolved in [federal c]ourt, ... the eminent domain proceedings shall go forward in accordance with State law ... to determine the sole remaining issue of valuation of [the] properties."

## DISCUSSION

## I. JURISDICTION

### A. The Removal Statutes

Section 1441(a) of Title 28 provides in pertinent part that "any civil action brought in a State court of which the district courts of the United States have origi-

---

1. The City of Yonkers has not sought appellate review of the denial of its motion to vacate the

Consent Decree and indeed is precluded from doing so under the terms of that decree.

nal jurisdiction, may be removed by the *defendant* ..., to the district court ... for the district ... where such action is pending" (emphasis added). The civil rights removal statute, 28 U.S.C. § 1443(2), provides in pertinent part that any civil action commenced in state court "[f]or any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law" may be removed "by the *defendant* to the district court ... for the district ... embracing the place wherein it is pending" (emphasis added).

The initial question to be considered on this appeal is whether the City of Yonkers was correctly deemed by the district court to be a defendant for removal purposes under either statute. Appellants argue that Yonkers was not a proper party to petition the state court to remove the Article 78 proceedings since it was the plaintiff in the underlying condemnation proceedings, and the Article 78 proceedings were merely state law procedural vehicles for raising defenses to the condemnation petitions. *See Matter of Piotrowski v. Town of Glenville*, 101 A.D.2d 654, 475 N.Y.S.2d 511, 512 (3d Dep't 1984) (defenses to condemnation action are properly brought via an Article 78 proceeding); *but cf. Town of Coxsackie v. Dernier*, 105 A.D.2d 966, 482 N.Y.S.2d 106, 107 (3d Dep't 1984) (challenge to condemnation may be made by way of an answer in that proceeding). In this regard, appellants cite two Supreme Court decisions, *Mason City & Fort Dodge R.R. v. Boynton*, 204 U.S. 570, 579–80, 27 S.Ct. 321, 323–24, 51 L.Ed. 629 (1907) and *Chicago, Rock Island & Pac. R.R. v. Stude*, 346 U.S. 574, 580, 74 S.Ct. 290, 294, 98 L.Ed. 317 (1954), for the proposition that, regardless of the state's procedural provisions, where a party seeks to remove a condemnation proceeding to federal

court, the condemnor is the plaintiff and the condemnee is the defendant.

The United States and the NAACP,[2] intervenors herein, respond by pointing out that the actions removed from state court were the Article 78 proceedings, not the underlying condemnation proceedings. Indeed, the condemnation actions are still pending in state court. In the Article 78 proceedings, the City of Yonkers clearly was the defendant. Intervenors argue that the Article 78 actions were separate proceedings from the condemnation actions and that the *Mason City* and *Chicago, Rock Island* decisions are distinguishable.

Both Supreme Court decisions cited by appellants involved Iowa eminent domain statutes under which the condemnee was required to initiate a proceeding contesting the assessment of the condemned property's value arrived at by a sheriff's jury. In that separate proceeding, the condemnee was the plaintiff under state law. In each case, the Supreme Court held that in construing the removal statute, federal law determined who was the plaintiff and who was the defendant, *Chicago, Rock Island*, 346 U.S. at 580, 74 S.Ct. at 294; *Mason City*, 204 U.S. at 579, 27 S.Ct. at 323; *see Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 104, 61 S.Ct. 868, 870, 85 L.Ed. 1214 (1941) (state procedural law cannot supersede privilege of removal granted by federal statute), and that the condemnor remained the plaintiff for purposes of removal.

Intervenors contend that the Article 78 proceedings were fundamentally different from the state court actions in *Mason City* and *Chicago, Rock Island*, which constituted challenges to property valuations. Their argument essentially is that the issues decided in the removed Article 78 proceedings—whether the City complied with state procedural requirements, whether the sites were properly designated, and wheth-

---

**2.** In the district court, the City of Yonkers opposed Judge Sand's assertion of removal jurisdiction over the Article 78 proceedings. In its brief on appeal, the City has again questioned whether the district court properly "divest[ed] the New York Supreme Court of jurisdiction to resolve the Article 78 proceedings." The City of

Yonkers Brief at 8. Nevertheless, because in the City's view, "it would be wasteful to require the matters to be relitigated in the state court," *id.* at 9, the City has argued on appeal in favor of an affirmance on the jurisdictional issue as well as on the disposition of the merits of the Article 78 petitions.

er the condemnation of the Seminary site violated the first amendment—were separate issues resolvable apart from the question of the valuation of appellants' properties, the sole remaining question in the condemnation actions. On the other hand, as appellants persuasively point out, the defenses they raised in their answers to the condemnation petitions were identical to their claims in the Article 78 petitions.

In view of the foregoing, we have serious doubts in light of *Mason City* and *Chicago, Rock Island* whether the removal statutes provided a proper basis to compel the City of Yonkers to remove the Article 78 proceedings to federal court. Quite simply, a party who is in the position of a plaintiff cannot remove. *Cf. White v. Wellington,* 627 F.2d 582, 586 (2d Cir.1980) ("right to remove is statutory, jurisdictional and absolute"). Nevertheless, we need not resolve this difficult question since the district court asserted an independent basis for removal jurisdiction under the All Writs Act. We turn now to consideration of removal under that statute.

## B. The All Writs Act

■ The All Writs Act (the "Act") provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Act "authorizes a federal court in exceptional circumstances to issue such orders to persons 'who, though not parties to the original action or engaged in wrongdoing, are *in a position to frustrate* the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice.'" *Benjamin v. Malcolm,* 803 F.2d 46, 53 (2d Cir.1986) (emphasis added) (quoting *United States v. New York Telephone Co.,* 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977) (citations omitted)), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1358, 94 L.Ed.2d 528 (1987). Although the Supreme Court has indicated that the All Writs Act, as a "residual source of authority," ordinarily does not empower federal courts "to issue ad hoc writs" to circumvent compli-

ance with a statute that "specifically addresses the particular issue at hand," the Act may be invoked "to fashion extraordinary remedies when the need arises." *Pennsylvania Bureau of Correction v. United States Marshals Serv.,* 474 U.S. 34, 43, 106 S.Ct. 355, 361, 88 L.Ed.2d 189 (1985); *see United States Alkali Export Ass'n v. United States,* 325 U.S. 196, 201–04, 65 S.Ct. 1120, 1124–26, 89 L.Ed. 1554 (1945) ("extraordinary power" of All Writs Act may be invoked even when another federal statute ordinarily would govern the issue).

Petitioners maintain that the federal removal statutes are the exclusive sources of removal jurisdiction. We disagree. In *Pennsylvania Bureau of Correction,* the Supreme Court expressly left open the question of the availability of the All Writs Act in exceptional circumstances to issue the writ when traditional statutory procedures clearly are inadequate. *See* 474 U.S. at 43, 106 S.Ct. at 361. In this case, the district court was confronted both with the need to vindicate the constitutional rights of those in Yonkers who have been denied fair housing and the very real possibility that the City of Yonkers would be subjected to inconsistent orders from the state court and the federal court. *Cf. Alkali,* 325 U.S. at 203, 65 S.Ct. at 1125 ("asserted conflict" between jurisdiction of federal court and that of government agency warranted exercise of power of All Writs Act to issue writ of certiorari in order to obtain review of interlocutory order). The Supreme Court has made clear "the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *New York Telephone Co.,* 434 U.S. at 172, 98 S.Ct. at 372; *accord Pennsylvania Bureau of Correction,* 474 U.S. at 40, 106 S.Ct. at 360.

The obligation of the City of Yonkers under the Constitution of the United States to remedy violations of civil rights is paramount. *See, e.g., Cooper v. Aaron,* 358 U.S. 1, 18–20, 78 S.Ct. 1401, 1409–11, 3

L.Ed.2d 5 (1958); *Brown v. Board of Educ. II*, 349 U.S. 294, 300–01, 75 S.Ct. 753, 756–57, 99 L.Ed. 1083 (1955). The fact that petitioners were not parties to—and in their words "had absolutely no connection with"—the underlying discrimination lawsuit is of little consequence. The Raceway and the Seminary are in a position now—whether willingly or not—to frustrate implementation of the Consent Decree. We believe this is just the sort of extraordinary circumstance envisioned by the All Writs Act.

This court previously has held that the All Writs Act enables a federal court in an exceptional case to exercise its "residual jurisdictional authority" to issue orders against non-parties to a civil rights action in order to vindicate the constitutional rights of existing parties. *See Benjamin v. Malcolm*, 803 F.2d at 53. *In Benjamin*, we affirmed an order of the district court joining, as third-party defendants pursuant to Fed.R.Civ.P. 19(a) and the All Writs Act, state officials who were " 'in a position to frustrate the implementation of a court order' " to alleviate overcrowding in New York City's detention center on Rikers Island. *Id.* (quoting *New York Telephone Co.*, 434 U.S. at 174, 98 S.Ct. at 373). In rejecting the state's claim that the district court could not assert jurisdiction over state officials under the All Writs Act, we noted that the district court "was faced with the necessity of acting immediately to relieve already-adjudicated unconstitutional conditions ... and of avoiding the delay that would be entailed in the relitigation of those conditions." *Id.* Consequently, we held that exceptional circumstances justified the exercise of jurisdiction under the All Writs Act.

In the instant case, the record indicates that had the district court known from the outset that the Raceway and the Seminary would challenge the designation of their properties for condemnation as "null and void," the Consent Decree would have included a provision requiring that the condemnation proceedings be instituted in federal court, presumably under the "residual jurisdictional authority" of the All Writs Act. In retrospect, the assertion by the

district court of jurisdiction in the first instance over the condemnation of petitioners' properties might have been a better course of action. We certainly would be less troubled by the use of the All Writs Act to initiate the condemnation proceedings in federal court had Judge Sand deemed petitioners to be necessary third parties to the implementation of the Consent Decree in the underlying civil rights litigation. Nevertheless, we must decide the case before us, and as a practical matter we see no reason why it is any less "necessary or appropriate" at this stage of the proceedings to invoke the authority of the All Writs Act. *Cf. In re Baldwin-United Corp.*, 770 F.2d 328, 337 (2d Cir. 1985) (using All Writs Act to enjoin non-parties from *commencing* actions in state court where such proceedings would "threaten[ ] to frustrate proceedings in a federal action"). Moreover, were we to decide that removal was improper under the All Writs Act, the state court would be faced with a situation in which any order it issued that was inconsistent with the Consent Decree would be subject to the injunctive powers of the federal court under the exception provisions of the Anti–Injunction Act. *See* 28 U.S.C. § 2283 (federal court may not grant injunction against state court "except as expressly authorized by ... Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments"); *see also Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 501 F.2d 383, 384 (4th Cir.1974) (possibility of "conflicting orders from state and federal courts" sufficient to warrant injunctive relief against state court under 28 U.S.C. § 2283). Use of the All Writs Act in this case to effectuate removal thus seems to us to be a less drastic, and therefore preferable, result.

In sum, we agree with the district court that this is indeed an exceptional case. While we too have confidence in the "ability, objectivity, [and] integrity of the state court" to render an appropriate decision in an Article 78 proceeding, the fact remains, as the district court recognized, that "the issues raised [by the Article 78 proceed-

ings] go to the very essence" of the Consent Decree. If this case simply involved ordinary condemnation proceedings collateral to the implementation of the housing remedy order, that would be one thing. *Cf. Pennsylvania Bureau of Correction*, 474 U.S. at 40, 106 S.Ct. at 360 (All Writs Act does not authorize federal court to order United States Marshals "to transport state prisoners from state prisons to the federal courthouse *in the ordinary course of litigation*") (emphasis added). But as the United States has recognized, "[t]he City's condemnation petitions, initiated pursuant to court order, must be seen in the context of the *Yonkers* [civil rights] litigation. The condemnor here is not the City acting in isolation[,] but the City acting at the behest of the court[,] the *Yonkers* plaintiffs and . . . 'the people who have been deprived of opportunities for housing free of racial discrimination.' " Department of Justice Brief at 37 (quoting Judge Sand, Transcript of Proceedings, June 8, 1988).

Despite the City's assurances through its counsel that it would vigorously defend against the Article 78 petitions, we have serious doubts whether a reluctant condemnor, which at every opportunity has resisted implementation of the Housing Remedy Order, could be counted on in state court to adequately protect the integrity of the Consent Decree. To believe otherwise would be to ignore the fact that Yonkers entered into the Consent Decree and instituted the condemnation proceedings only after being threatened by the district court with sanctions for contempt. "One must realistically deal with the fact," Judge Sand explained, "that the positions which the city would be compelled to take in [state court] would be significantly contrary to positions taken by [it] in [the district] court." The inconsistency of these positions convinces us, therefore, of the necessity to exercise removal jurisdiction to prevent frustration of the Housing Remedy Order.

Accordingly, we hold that removal was proper under the All Writs Act. We do so because removal was necessary to protect the integrity of the Consent Decree and because the issues raised by the Article 78 petitions cannot be separated from the relief provided by the Consent Decree. *Cf. Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 501 F.2d at 384 (affirming issuance of injunction under Anti–Injunction Act because "issues being litigated in the state court proceeding could not be separated from the issues and relief involved in the federal court suit"). The implementation of that decree takes precedence over petitioners' desire to have the defenses to the condemnation of their properties litigated in state court. *Cf. North Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 45, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971). Given the exceptional circumstances presented here, it is clear that the power of the All Writs Act extended over petitioners who were "in a position to frustrate the implementation" of the Consent Decree. *New York Telephone Co.*, 434 U.S. at 174, 98 S.Ct. at 373. If the power exists to issue extraordinary orders under the Anti–Injunction Act and the All Writs Act to prevent the prosecution of state proceedings, surely in this case it also exists to effectuate removal notwithstanding the availability of an independent basis for the exercise of jurisdiction under the federal removal statutes. In any event, by removing the Article 78 proceedings to federal court, petitioners are not being deprived of their statutory right to assert defenses to the taking of their properties; they are merely being prevented from litigating those defenses in state court. We conclude, therefore, that because of the significant risk of inconsistent decrees from two courts, it was "necessary or appropriate" for the district court to invoke the residual jurisdictional authority of the All Writs Act.

## II. THE MERITS OF THE ARTICLE 78 PETITIONS

### A. EDPL

The Raceway and the Seminary contend on the merits that the City failed to comply with the notice, hearing and review requirements of Article 2 of New York's Eminent Domain Procedure Law (EDPL). In its condemnation petitions, the City

claimed to be exempt from compliance with the procedural requirements of the statute pursuant to the "emergency situation" provision of EDPL § 206.

Section 201 of the EDPL provides that, "prior to acquisition, the condemnor, in order to inform the public and to review the public use to be served by a proposed public project and the impact on the environment and residents of the locality where such project will be constructed, shall conduct a public hearing." The hearing must be held on at least ten days prior notice, EDPL § 202, and following the hearing, the condemnor is required, within ninety days, to make findings and a determination of the public purpose to be served by the proposed condemnation. EDPL § 204. The factors to be considered in making such determination and findings include:

(1) the public use, benefit or purpose to be served by the proposed public project;

(2) the approximate location for the proposed public project and the reasons for the selection of that location;

(3) the general effect of the proposed project on the environment and residents of the locality;

(4) such other factors as [the condemnor] considers relevant.

*Id.* § 204(B).

A condemnor is exempt from compliance with the provisions of Article 2 of the EDPL when, *inter alia,* "because of an emergency situation the public interest will be endangered by any delay caused by the public hearing requirement in this article." *Id.* § 206(D). The district court found that "[c]ontrary to the claims of St. Joseph's and the Raceway, the City of Yonkers, in a very real sense, *is* faced with an emergency" (emphasis in original). As the court further explained, "[t]his matter must end" because it is "tearing Yonkers apart and Yonkers is bleeding."

We believe that the district court's factual finding of such an "emergency situation" is amply supported by the record. *See id.* § 207(C)(3), (4) ("scope of the review shall be limited to whether ... determination and findings were made in accord-

ance with procedures set forth in [Article 2], and [whether] a public use, benefit or purpose will be served by the proposed acquisition"); *see also Gerges v. Koch,* 62 N.Y.2d 84, 476 N.Y.S.2d 73, 464 N.E.2d 441 (1984) (emergency situation presented by prison overcrowding warranted temporary exemption under New York City's Environmental Quality Review (CEQR) procedures, which parallel provisions of SEQRA, from filing environmental impact statement in order to begin renovation and construction of facilities as remedy for deprivation of constitutional rights of prisoners); *Board of Visitors–Marcy Psychiatric Center v. Coughlin,* 60 N.Y.2d 14, 466 N.Y.S.2d 668, 453 N.E.2d 1085 (1983) (same, except pursuant to SEQRA); *City of Yonkers v. Hvizd,* 93 A.D.2d 887, 461 N.Y.S.2d 408, (2d Dep't 1983) (existence of emergency situation endangering public interest warrants application of EDPL 206(D) exemption); *Matter of Village of Malverne,* 70 A.D.2d 920, 418 N.Y.S.2d 93 (2d Dep't 1979) (same). More than two years after the issuance of the Housing Remedy Order and eight years since the commencement of the civil rights action, no housing remedy has been implemented. The public interest cannot wait any longer. We thus agree with the district court that the "1200 people on the waiting list for public housing in Yonkers have a right to a remedy," and in our judgment any further delay—aside from that which is necessary to address the first amendment claim of the Seminary as discussed in Part II. C. below—would be intolerable.

■ Appellants maintain that the only emergency in this case is the result of Yonkers own intransigence, and consequently that full compliance with the terms of the statute cannot be excused. We disagree. An assessment of blame regarding the predicament in which Yonkers presently finds itself is quite frankly irrelevant to a determination of whether or not Yonkers is faced with an "emergency situation" under the statute. *Cf. Gerges,* 62 N.Y.2d at 95, 476 N.Y.S.2d at 78 (that municipal officials "might have foreseen and ... made appropriate provision for ... resolution" of

emergency situation regarding constitutionally inadequate prison facilities "does not negate the existence of the present crisis"). Indeed, the very purpose of the exemption provisions under Article 2 of the EDPL is to excuse compliance with the procedural requirements of the statute when the public interest so requires. *See City of Buffalo Urban Renewal Agency v. Moreton*, 100 A.D.2d 20, 473 N.Y.S.2d 278, 281 (4th Dep't 1984); *see also Jackson v. New York State Urban Dev. Corp.*, 67 N.Y.2d 400, 503 N.Y.S.2d 298, 305, 494 N.E.2d 429, 436 (1986) ("principal purpose of Article 2 ... is to ensure that [the condemnor] does not acquire property without having made a reasoned determination that the condemnation will serve a valid public purpose").

■ Appellants concede that the construction of low income housing in Yonkers required by the Housing Remedy Order would serve a valid public purpose. In addition, as the district court stated, "[t]he process by which the public housing sites designated in the Consent Decree were determined, the notoriety of that process, the review already given to those sites and the continuing review ... by HUD certainly satisfied the substance of the State law provisions upon which St. Joseph's and the Raceway predicate their claims." *See also Aswad v. City School Dist.*, 74 A.D.2d 972, 425 N.Y.S.2d 896, 898 (3d Dep't 1980) (holding that "substantial compliance" with exemption provisions of section 206 and four factors enumerated in section 204(B) was sufficient to confirm proposed condemnation). We agree that there was substantial compliance with the requirements of the EDPL in this case. During extensive proceedings before the district court, the City's independent planning experts, the court-appointed Outside Housing Advisor, the Municipal Housing Authority and the City's Community Development Agency all participated in a thorough review of the location, distribution and suitability of the designated sites. With regard to the "general effect" of the proposed condemnations "on the environment and residents of the locality," EDPL § 204(B)(3), HUD conducted a preliminary evaluation as part of its ongoing review of the sites and reported to the district court that the housing plan appeared to meet site, neighborhood and environmental standards for public housing. *See generally* 24 C.F.R. § 941.202 (1988).

Consequently, given the undisputed public purpose inherent in the implementation of the Housing Remedy Order and the nature and extent of the review process, we are convinced that there was a valid determination that the proposed condemnations would be in the public interest as required under Article 2 of the EDPL.

**B. SEQRA**

■ The New York State Environmental Quality Review Act (SEQRA), Environmental Conservation Law (ECL) § 8–0101 *et seq.*, requires the preparation of an environmental impact statement (EIS) by state and local agencies "on any action they propose or approve which may have a *significant effect* on the environment." *Id.* § 8–0109(2) (emphasis added). Pursuant to regulations adopted thereunder, the Department of Environmental Conservation has determined the types of actions having such a "significant effect" ("Type I" actions) for which an EIS must be prepared. 6 NYCRR § 617.12. When an EIS is required, the full panoply of procedures prescribed under SEQRA comes into play. *See* ECL § 8–0109. If, on the other hand, it is determined that the proposed action is one not likely to have a significant effect on the environment ("Type II" action), then such action "do[es] not require [an] environmental impact statement[] or any other determination or procedure" under SEQRA. 6 NYCRR § 617.13; *see Jackson v. New York State Urban Dev. Corp.*, 67 N.Y.2d 400, 503 N.Y.S.2d 298, 304, 494 N.E.2d 429, 435 (1986) ("the heart of SEQRA is the [EIS] process"); *see also* CPLR § 7803(3) (scope of review is limited to whether determination was "arbitrary[,] capricious or an abuse of discretion").

Although appellants concede that the proposed condemnations of the two sites are not Type I actions requiring the preparation of an EIS, *see* 6 NYCRR § 617.12(b),

they argue nonetheless that an environmental assessment of the proposed condemnations should have been made to determine if there would be a significant impact on the environment. *See* ECL § 8–0109(4); 6 NYCRR § 617.6(a)(1)(i). However, as indicated in Part II. A. above, HUD is in the process of conducting an environmental review of the proposed housing sites pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq. See* 24 C.F.R. § 941.208(b) (1988); *see also* EDPL § 204(B)(3) (requiring consideration by condemnor of "the general effect of the proposed project on the environment"). Thus, the environmental assessment that appellants seek is in fact taking place.

In any event, we agree with the district court that the proposed condemnations of the Raceway and the Seminary sites are exempt from compliance with SEQRA. The implementing regulations to SEQRA expressly provide an exemption for actions "required to be undertaken pursuant to a judgment or order" and for "actions ... of any court." 6 NYCRR § 617.2(q)(1), (5). Accordingly, in view of the fact that the City was compelled by a federal court order to institute condemnation proceedings against the subject properties and that there was, as the district court found, a "meticulous inquiry" regarding environmental factors, we conclude that the requirements of SEQRA were satisfied in all respects.

## C. The First Amendment

We come finally to the Seminary's challenge to the condemnation of its property on first amendment grounds.[3] In its Article 78 petition, the Seminary alleged that "[b]y the inclusion of the subject property in the [Consent Decree] and by the commencement of the condemnation proceeding, [the City] has attempted to regulate the use of church owned property without any compelling public interest and has sought the acquisition of the subject property in violation of ... the First and Fourteenth Amendments to the United States Constitution." The Seminary's position is that, because the district court recognized on a number of occasions the availability of suitable alternate sites to the Seminary parcel and repeatedly stated its willingness to modify the Consent Decree should the City designate such an alternate site, no compelling need existed to justify the proposed condemnation of the Seminary's property.

The first amendment provides that "Congress shall make no law ... prohibiting the free exercise [of religion]." U.S. Const. amend. I; *see Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940) (first amendment free exercise clause is applicable to states through fourteenth amendment). In order to show that a particular governmental action implicates the free exercise clause, the aggrieved party must show that the challenged action—in this case, the condemnation of church-owned property—would coerce a violation of religious beliefs or would penalize the practice of religion by denying the aggrieved party "an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* — U.S. ——, 108 S.Ct. 1319, 1325, 99 L.Ed.2d 534 (1988). *See also School Dist. of Abington Twp. v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963) (coercion); *Sherbert v. Verner,* 374 U.S. 398, 402–06, 83 S.Ct. 1790, 1792–95, 10 L.Ed.2d 965 (1963) (penalty). The state may, however, justify any such limitation on religious liberty by showing that its action is essential to accomplish an overriding or compelling governmental interest.

**3.** The Seminary also challenges the proposed taking of its property under Article I, § 3, of the New York State Constitution. The Seminary did not make any argument in the district court or in its brief on appeal, however, based specifically on New York law. We thus are afforded no grounds to consider whether New York's "free exercise and enjoyment of religious ... worship" clause provides any broader protection than the first amendment regarding the City's proposed acquisition of the Seminary site, *cf. Brown v. McGinnis,* 10 N.Y.2d 531, 225 N.Y. S.2d 497, 180 N.E.2d 791 (1962), and proceed therefore to consider just the Seminary's federal constitutional claim.

*See, e.g., Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987); *Bob Jones Univ. v. United States*, 461 U.S. 574, 603, 103 S.Ct. 2017, 2034, 76 L.Ed.2d 157 (1983); *United States v. Lee*, 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055–56, 71 L.Ed.2d 127 (1982).

The Seminary's free exercise challenge to the proposed taking of its property raises an issue which has only very rarely been presented. While the condemnation of church property for public use is not unheard of, *see, e.g., United States v. 564.54 Acres of Land, More or Less*, 506 F.2d 796 (3d Cir.1974); *Foster v. Herley*, 491 F.2d 174 (6th Cir.1974); *Kozemchak v. Ukrainian Orthodox Church of Am.*, 443 F.2d 401 (2d Cir.1971), we are aware of no federal court case in which a religious organization has challenged the taking of real property on free exercise grounds. The parties in the instant case, however, have discussed at some length a decision of the Colorado Supreme Court, *Pillar of Fire v. Denver Urban Renewal Auth.*, 181 Colo. 411, 509 P.2d 1250 (1973), in which this precise issue was considered, apparently for the first time.

In *Pillar of Fire*, an evangelical sect sought to enjoin a municipal urban renewal agency from condemning a church building said to have unique religious significance. The building was alleged to be *sui generis* and the birthplace of the Pillar of Fire denomination. However, the record contained no findings indicating that the trial court weighed the competing interests of church and state regarding the proposed condemnation. After expressing concern about "direct confrontations of the sort in this case [which] have been avoided because legislatures and administrative bod-

ies have generally accorded *great respect* to religious organizations," 509 P.2d at 1254 (emphasis added), the Colorado Supreme Court remanded the case to the trial court for a full hearing. The court noted that the "loss of the Pillar of Fire [Church] would allegedly go far beyond the incidental burden of having to move to a new location" and, as a result of the competing interests involved, required that on remand a determination be made whether the state had a "substantial interest" in the taking of the alleged birthplace of the Pillar of Fire Church "without a reasonable alternate means of accomplishment" of its plans for urban renewal. *Id.* at 1253–54; *see Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *cf. Father Flanagan's Boys' Home v. Millard School Dist.*, 196 Neb. 299, 242 N.W.2d 637 (condemnation of 40–acre tract of farmland owned by church would not substantially interfere with church's school program since more than 900 acres would remain after taking), *cert. denied*, 429 U.S. 887, 97 S.Ct. 240, 50 L.Ed.2d 168 (1976). Although the Colorado court conceded that church property could be taken by eminent domain for "paramount public use," 509 P.2d at 1254 (citation omitted), the court nonetheless concluded that the church was entitled to a hearing on the merits of its first amendment claim.[4]

In support of its claim of a free exercise infringement, the Seminary, during the June 8, 1988 proceedings before the district court, relied principally on an affidavit of Monsignor Edwin O'Brien, the Rector at St. Joseph's, who stated that the Seminary grounds, including the two acres designated for public housing, form an "apron" of

---

**4.** On remand, the trial court found that, despite Pillar of Fire's allegations to the contrary, the church property was neither the birthplace nor the mother church of the Pillar of Fire denomination. When the case returned to the Colorado Supreme Court on appeal, the court upheld the trial court's subsequent finding that the church property was not *sui generis* and also cited evidence from the record supporting the state's "weighty and substantial" need for the property. *Denver Urban Renewal Auth. v. Pillar*

*of Fire*, 191 Colo. 238, 552 P.2d 23, 25 (1976). In the court's view, even had Pillar of Fire proven that the church building was *sui generis*, the record now indicated a substantial state interest in the condemnation of the building without an alternate means of accomplishing the urban renewal project. Accordingly, the Colorado Supreme Court affirmed the trial court's decision allowing the condemnation of the Pillar of Fire Church.

quietude surrounding St. Joseph's and contribute to the "atmosphere of quiet reflection" essential to the "academic, spiritual, psychological and pastoral" preparation of young men for the priesthood. Monsignor O'Brien also averred that the two-acre site together with the remaining forty-two acres of church property have been used for religious purposes by the Archdiocese at least since the opening of the Seminary in 1896 and that "the construction of multifamily housing ... [would] substantially affect our work at St. Joseph's," the only facility in the Archdiocese for the training of new priests.

The district court considered without resolving the question of whether the taking of the Seminary's property would constitute an interference with the free exercise rights of the Archdiocese. Counsel for the Seminary argued before the district court that, because the use of the two acres would substantially affect the work at the Seminary, the condemnation of the site would violate the first amendment. He added, however, that that "doesn't mean ... the church could not agree voluntarily ... to the use of the property ..., but [the property] is not going to be ... willingly subjected to condemnation under this plan." Clearly perplexed by the "varying positions" of the Archdiocese regarding the inclusion of its property as part of the Consent Decree, the district court described the Seminary's claim of religious interference as equivocal: "if there [is] agreement by the Archdiocese with the overall plan, it [would] allow the use of this property, and that would not interfere with free exercise rights; but since the Archdiocese has reservations ... with respect to the overall plan, it is resisting the taking on free exercise grounds." Nevertheless, the district court assumed the validity of the Archdiocese's claim of religious use of the property and proceeded to balance the competing interests of church and state, finding that the purported constitutional necessity to include the Seminary property into the Consent Decree outweighed the Seminary's first amendment rights.

The Seminary argues on appeal that "while it is very true that a remedy for the proven segregative policies of the City is necessary, it is just as true that the Seminary property is *not* necessary to that remedy." Reply Brief at 22 (emphasis in original). The Archdiocese further contends that the City's refusal to modify the decree because it believed there were no "politically acceptable" alternatives to the Seminary site is hardly a sufficient reason to justify infringement of a first amendment privilege. In the Seminary's view, therefore, the district court's conclusion concerning the compelling need for the Seminary's property was simply not supported by the record.

Appellees respond first by claiming that under *Lyng* the Seminary was unable to show that the condemnation of its property would have a coercive or penal effect on the practice of religion. *See* 108 S.Ct. at 1325. In *Lyng,* members of three Indian tribes in northwest California challenged a United States Forest Service plan to build a paved 75–mile road connecting two towns, Gasquet and Orleans, on a 6–mile stretch of land located in the Six Rivers National Forest that, *while owned by the federal government,* traditionally had been used by the Indians for religious purposes. The Forest Service commissioned a study of the American Indian cultural and religious sites in the Chimney Rock area of Six Rivers which found that the region was integral to Indian religious ritual, and that "privacy, silence, and an undisturbed natural setting" were necessary to the practice of their religion. *Id.* at 1322. The report accordingly recommended that the roadway not be completed. The Forest Service decided, however, not to adopt this recommendation and proceeded to select a route through the Chimney Rock area as far removed as possible from the archeological and other sites used by the Indians for spiritual activities. Alternate routes specifically were considered and rejected "because they would have required the acquisition of *private land,* had serious soil stability problems, and would in any event have traversed areas having ritualistic value to American Indians." *Id.* (emphasis added).

The Supreme Court in *Lyng* held that notwithstanding the undisputed severe adverse effects completion of the proposed roadway would have on the practice of the Indians' religion, "[w]hatever rights the Indians may have to the use of the [Chimney Rock] area ..., those rights do not divest the Government of its right to use what is, after all, *its* land." *Id.* at 1327 (emphasis in original) (citation omitted). While recognizing that "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment," the Court noted that "[t]his does not and cannot imply that *incidental* effects of government programs, which may make it more difficult to practice certain religions but which have no *tendency* to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions." *Id.* at 1326 (emphasis added).

█ Appellees seize upon the first amendment principles considered in *Lyng* in support of their contention that the free exercise clause does not prohibit governmental action that would substantially interfere with the practice of religion so long as the government's conduct is not actually coercive or penal in nature. We disagree. The *Lyng* Court declined to determine the "exact line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government of its own affairs." *Id.* The Supreme Court merely held that "whatever" the effect completion of the roadway might have on traditional Indian religious practices, the government could not be denied use of its own land. *Id.* at 1327 (citing with approval *Bowen v. Roy*, 476 U.S. 693, 724–27, 106 S.Ct. 2147, 2164–66, 90 L.Ed.2d 735 (1986) (O'Connor, J., concurring in part, dissenting in part) (distinguishing between government's use of Social Security number in its possession to aid administration of welfare programs and the government's *requiring* individual to provide such information)). Besides, as Judge Lumbard has recognized, the government's use of its property involves significantly different considerations than the taking by the government of privately-owned religious property. *See Wilson v. Block*, 708 F.2d 735, 742 n. 3 (D.C.Cir.) (Lumbard, J., sitting by designation) (distinguishing *Pillar of Fire* ), *cert. denied*, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983). Incidental burdens on the practice of religion will not suffice to require the state to come forward with a compelling reason justifying its actions. When, as is claimed in this case, however, a proposed governmental action would substantially affect religious practice, there exists at least a material issue of fact concerning whether the state has interfered with the free exercise of religion. *Cf. Lyng*, 108 S.Ct. at 1326; *see Wisconsin v. Yoder*, 406 U.S. at 218, 92 S.Ct. at 1534; *see also Johnson v. Katz*, 68 N.Y.2d 649, 505 N.Y.S.2d 64, 65, 496 N.E.2d 223, 224 (1986) (lack of "material issue of fact" warrants dismissal of Article 78 petition without a hearing); CPLR § 7804(h) (requiring hearing on any "triable issue of fact").

█ The Seminary's initial willingness to sell the two-acre parcel in January 1988 does not alter our determination that the proposed taking of the Seminary's property raises a significant question under the first amendment. As the district court itself stated, "if [the] taking [of] these two acres [constitutes] an interference with [the] free exercise of a religion[,] that is the case regardless of what the attitude of the church is to the overall [housing] plan." There is in our judgment an enormous difference between the Archdiocese agreeing to sell its property and the government proceeding to condemn it. We certainly do not take lightly the Seminary's claim of interference with a first amendment right. In any event, the district court assumed for purposes of its decision the validity of the Seminary's claim of religious interference. To have held otherwise, the district court would have had to hold a plenary hearing on the issue. Indeed, since the record before us does not reflect a considered judgment on the religious interference question, we do not preclude the district court on remand from addressing this issue. Never-

theless, we too accept as true for purposes of this appeal the Archdiocese's allegations that the taking of the Seminary site would "substantially affect [the] work at St. Joseph's" and that the site is "essential" to the Seminary's mission. *Cf. Pillar of Fire,* 509 P.2d at 1253–54.

■ Turning to the question of whether the condemnation of the Seminary's property is essential to achieve a compelling state interest, it is well settled that a limitation by the government on the free exercise of religion is permitted only when the state can demonstrate that a compelling interest justifies the restriction and that no alternate means of accomplishing the state's compelling interest are available. *See Brandon v. Board of Educ.,* 635 F.2d 971, 976 (2d Cir.1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981); *see also Sherbert v. Verner,* 374 U.S. at 406, 83 S.Ct. at 1795; *Pillar of Fire,* 509 F.2d at 1253. Consistent with the district court's disposition below, appellees assert that the inclusion of the Seminary property in the Consent Decree is essential to the implementation of the Housing Remedy Order.

We do not agree that this is necessarily so. Although the district court considered the universe of reasonable alternate sites to be limited to those "capable of being utilized in a federal decree [with] a reasonable timetable for implementation," the court also clearly recognized the availability of such sites since it was willing to permit the City to designate a substitute for the Seminary property. Thus, the City's steadfast refusal to propose a modification of the Consent Decree to delete the Seminary site does not provide a sufficient basis to justify interference with petitioner's first amendment rights. While the City now takes the position that the "framework for remedying the constitutional violation found by the district court cannot be modified simply by substituting sites [because t]here are no politically acceptable alternatives," City of Yonkers Brief at 35, the fact remains that political expediency is far from a compelling reason

to force the Seminary to give up its property in derogation of a constitutional right.

■ Consequently, assuming as we do for purposes of this appeal that the taking otherwise impermissibly burdens the Seminary's free exercise rights, the Seminary is entitled to be heard on the issue whether the taking is necessary to vindicate a compelling state interest. At such a plenary hearing with expert testimony from both sides and in which the competing interests of church and state are fully addressed and the availability of reasonable alternate sites seriously considered, the district court will be able to determine whether the public interest in remedying discrimination can be reasonably accomplished without the taking of the Seminary's property. The point is that on the basis of the existing record before us, we are not in a position to make an intelligent judgment in this matter one way or the other. The protections afforded by the first amendment require at the very least that the Seminary have a full and fair opportunity to have its rights considered in an attempt—consistent with the "great respect" courts accord religious groups—to avoid a direct confrontation between church and state. *See Pillar of Fire,* 509 P.2d at 1254. If accommodation between the competing interests of church and state is possible, then it ought to be pursued no matter how compelling the state interest might be. *See Lyng,* 108 S.Ct. at 1327–28 ("[n]othing in our opinion should be read to encourage governmental insensitivity to the religious needs of any citizen[; t]he Government's rights to the use of its own land, for example, need not and should not discourage it from accommodating religious practices") (citation omitted); *Wisconsin v. Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533; *Sherbert v. Verner,* 374 U.S. at 406–07, 83 S.Ct. at 1795–96.

\* \* \* \* \* \*

One final word is in order. The patience exhibited by the district court under enormously trying circumstances is commendable. Judge Sand has always kept sight of the decisive objective in this case: "[t]hat is, to build the [200 units of] housing as quickly as possible in a manner ... which

will enable future generations in Yonkers to look back and say this was the best possible housing in the best possible locations [that could be built] under the circumstances which obtained in 1988." We trust that the district court will find some way to facilitate reconciliation among everyone concerned in this case so that implementation of the first leg of the Housing Remedy Order can begin as quickly, and hopefully as smoothly, as possible.

## CONCLUSION

We affirm the district court's order denying petitioners' motions to remand for lack of federal removal jurisdiction under the authority of the All Writs Act. We also affirm the court's order dismissing the Article 78 petitions in every respect except with regard to the Seminary's first amendment challenge to the taking of its property which is remanded to the district court for further consideration consistent with the views expressed in this opinion. The mandate shall issue in 7 days, and it is so ordered.

*Affirmed in part, vacated and remanded in part.*

MAHONEY, Circuit Judge, dissenting:

I respectfully dissent. In my view, the Article 78 proceedings were improperly removed and should be remanded to state court. Accordingly, I would not reach the merits.

The facts respecting the removal are straightforward. The City commenced condemnation proceedings against the Raceway and the Seminary, as required by the Consent Decree, on April 21, 1988. The Raceway and the Seminary filed answers and, on May 18, 1988, filed Article 78 peti-

tions as well, presumably for protective reasons.[1]

On the morning of May 27, 1988, before any significant action had been taken in state court with respect either to the condemnation or Article 78 proceedings, the district court signed an order to show cause bringing on, later that morning, a motion by the United States in the federal litigation to compel the City to petition for removal of the Article 78 proceedings to the federal district court. The motion was granted, and the City so ordered, later that day. Accordingly, the City filed a petition for removal on May 31, 1988, whereupon the Raceway and Seminary moved to remand the Article 78 proceedings to state court.

On June 8, 1988, the district court heard arguments on both the motions to remand and the merits of the Article 78 proceedings. That day, the district court denied the motions to remand, rejected all of the claims raised by the Raceway and the Seminary concerning the merits of the Article 78 proceedings, and dismissed the Article 78 proceedings. The district court then ordered:

> that St. Joseph's and the Raceway shall forthwith each serve on the State court in the pending eminent domain proceedings against their properties a copy of this Order and present to such Court a proposed order stating that, insofar as all substantive grounds for objection to the proceedings in question have been fully litigated and resolved in this Court, the City of Yonkers' petitions in those actions should be granted and the eminent domain proceedings shall go forward in accordance with State law in order to determine the sole remaining issue of valuation of St. Joseph's and the Raceway's properties.[2]

---

1. *Compare Piotrowski v. Town of Glenville,* 101 A.D.2d 654, 475 N.Y.S.2d 511 (3d Dep't 1984) (defenses to a taking of property by condemnation properly raised by initiation of separate Article 78 proceeding), *with Town of Cocksackie v. Dernier,* 105 A.D.2d 966, 482 N.Y.S.2d 106 (3d Dep't 1984) (such defenses may be raised by answer in condemnation proceeding). The Raceway and the Seminary posed the same defenses both by answer in the condemnation

proceedings and in their separate Article 78 proceedings; the latter also sought to enjoin the condemnation proceedings.

2. Because only the Article 78 proceedings had been removed, the condemnation proceedings remained pending before the state court, thus providing a basis for a state court determination as to value.

Against this background, the majority concludes that removal of the Article 78 proceedings pursuant to the general removal statute, 28 U.S.C. § 1441 (1982 and Supp. IV 1986), or the civil rights removal statute, 28 U.S.C. § 1443 (1982), presents a "difficult question," but that removal is in any event authorized by the All Writs Act, 28 U.S.C. § 1651(a) (1982). I disagree with both conclusions.

As to the general and civil rights removal statutes, both allow removal only by a "defendant" (or, in the case of section 1441, "defendants," presumably a distinction without a difference), and the Supreme Court has twice held that whatever labels state law may apply, a condemnee is a defendant for purposes of federal removal statutes. See Chicago, Rock Island & Pac. R.R. v. Stude, 346 U.S. 574, 580, 74 S.Ct. 290, 294, 98 L.Ed. 317 (1954); Mason City & Fort Dodge R.R. v. Boynton, 204 U.S. 570, 579–80, 27 S.Ct. 321, 323–24, 51 L.Ed. 629 (1907). In both those cases, as here, a complaining landowner was required by state law to initiate an action to raise objections to condemnation, in which action the landowner was denominated the "plaintiff" by state law. Both cases held the landowner/condemnee was the defendant for federal removal purposes, regardless of state law, and therefore the only party that could remove the case to federal court.

In all candor, given the clear language of the pertinent statutes and the equally clear holdings of two Supreme Court decisions, I do not regard this question as difficult, or even close. Removal is manifestly not warranted by 28 U.S.C. § 1441 (1982 and Supp. IV 1986) or 28 U.S.C. § 1443 (1982). This brings us to the All Writs Act, 28 U.S.C. § 1651(a) (1982). Cf. 28 U.S.C. § 2283 (1982) (federal court stay of state court proceedings).

Echoing the rationale expressed by the district court, the majority concludes that "because of the significant risk of inconsistent decrees from two courts, it was 'necessary or appropriate' [within the meaning of 28 U.S.C. § 1651(a) (1982)] for the district court to invoke the residual jurisdictional authority of the All Writs Act." The majority notes also that, in light of the history of the underlying federal litigation, the City is likely to be a reluctant and ineffective party to the state condemnation proceedings, whatever assurances it may give to the federal district court in that regard.

In reaching this conclusion, the majority cites and discusses the leading Supreme Court case on this issue, Pennsylvania Bureau of Correction v. United States Marshals Service, 474 U.S. 34, 106 S.Ct. 355, 88 L.Ed.2d 189 (1985), but never sets forth the basic rule articulated in that case for a situation where, as in the case of removal, other federal statutes address the issue or situation before the court. That rule is:

> The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling. Although the Act empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate.

Id. at 42–43, 106 S.Ct. at 361.

Pennsylvania Bureau of Correction held that the pertinent habeas corpus statute, which stated that the writ should be directed "to the person in whose custody the party is detained," did not authorize direction of the writ to a noncustodian; and that the All Writs Act should not be invoked for that purpose in view of the statute specifically addressed to the situation and making a different provision. Id. at 42–45, 106 S.Ct. at 360–61. The court, added, however:

> There may be exceptional circumstances in which a district court can show clearly the inadequacy of traditional habeas corpus writs, such as where there are serious security risks. In such circumstances, a district court may find it "necessary or appropriate" for Marshals to transport state prisoners. We therefore leave open the question of the availability of

the All Writs Act to authorize such an order where exceptional circumstances require it.

*Id.* at 42–43, 106 S.Ct. at 361.

When the issue which this court must decide is properly framed in terms of the controlling authority of *Pennsylvania Bureau of Correction,* it is apparent that the removal undertaken below and approved by the majority here was not warranted by the All Writs Act. Whatever the difficulties in the underlying federal civil rights litigation, to which of course the Raceway and the Seminary are not parties, I see no warrant for a preemptive strike upon a state court which had not even begun to consider the eminent domain proceedings pending before it.

Both the district court below and the majority here acknowledge the "ability, objectivity, [and] integrity of the state court." The officers of that state court are, it might be added, sworn to support the Constitution of the United States. U.S. Const. Art. VI, cl. 3. Accordingly, the state court was entitled to a presumption at the outset of the condemnation proceeding that it would proceed with sensitivity to and awareness of the legal and social context in which the condemnations are occurring.[3] In sum, there was no basis to disregard the "principles of equity, comity and federalism," *see Mitchum v. Foster,* 407 U.S. 225, 243, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972); *see also Kerr–McGee Chemical Corp. v. Hartigan,* 816 F.2d 1177, 1181–82 (7th Cir.1987), which should govern our consideration of this issue.

The authorities cited by the majority in support of removal are easily distinguishable. *United States Alkali Export Ass'n, Inc. v. United States,* 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945), construed the All Writs Act to authorize an appeal of a district court determination that it had jurisdiction over a dispute whose resolution, in the Supreme Court's view, Congress had entrusted exclusively to the Federal Trade Commission. There is no question here that the state court is an appropriate forum to deal with eminent domain proceedings under state law.

The All Writs Act was invoked in *Benjamin v. Malcolm,* 803 F.2d 46 (2d Cir.1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1358, 94 L.Ed.2d 528 (1987), to allow the addition of state defendants in a lawsuit challenging overcrowding in New York City jails where the state was dilatory in accepting transfer of prisoners, thus precluding correction of constitutional violations, and relief could not practically be achieved without the decreed joinder. *United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), is similar. Again, there is no question here of adding parties in order to achieve an effective remedy. *In re Baldwin–United Corp.,* 770 F.2d 328 (2d Cir.1985), found authority in the All Writs Act to enjoin non-parties from commencing state court actions which would undermine the impending settlement of a multidistrict federal class action, a situation totally afield from the present litigation.

*Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 501 F.2d 383 (4th Cir.1974), found warrant in an express exception to the Anti-injunction Act, 22 U.S.C. § 2283 (1982),[4] to prohibit defendants in a federal school desegregation suit from pursuing a state court action invoking a state statute expressly designed to frustrate school desegregation, noting the possibility of "conflicting orders from state and federal courts." *Id.* at 384.

---

**3.** It was similarly premature to allow removal on the assumption that the City would be a reluctant condemnor when, whatever weight is accorded to that hypothesis, the United States and/or the N.A.A.C.P. could seek to intervene in the state court proceedings, and it appears likely that such an application would be granted. *See* N.Y.Civ.Prac. L. & R. 1013 (1976); *Bay State Heating & Air Conditioning Co. v. Am. Ins. Co.,* 78 A.D.2d 147, 434 N.Y.S.2d 66 (4th Dep't.1980).

**4.** 22 U.S.C. § 2283 (1982) provides:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

Perhaps my colleagues' invocation of the *Swann* decision best highlights my disagreement with the majority's ruling. The defendants who were enjoined in *Swann* were principals in protracted federal school desegregation litigation who initiated state court proceedings likely to result in orders pursuant to state law which would contradict and undermine the desegregation orders of the federal court. Here, on the contrary, the Raceway and Seminary are not parties to the underlying federal civil rights litigation, and invoke only the normal rights under New York and federal law of owners of property designated for condemnation by a public authority. It would, of course, be ludicrous to enjoin the Raceway and the Seminary from participating further in the state condemnation proceedings. Since only such an injunction would put this case on all fours with *Swann,* it is clear that *Swann* provides no authority for the course followed here.

There was no analogue in *Swann,* moreover, to the action of the district court here in removing the Article 78 proceedings from state court, purporting to determine all the substantive issues in that proceeding the same day the removal occurred, and then directing the parties to present a proposed order to the state court, before which the related condemnation proceedings remained pending, reciting that all the substantive issues in the condemnation proceedings had been decided and the state court should accordingly proceed "to determine the sole remaining issue of valuation."

I am afraid that the fevered and highly publicized situation in Yonkers has led both the district court and my colleagues to a novel and unwarranted application of the All Writs Act which is abusive both of the condemnees and, more importantly, of the most elementary principles of the comity that should exist between federal and state courts. I would not, of course, following *Pennsylvania Bureau of Correction,* rule out the use of the extraordinary residual authority provided by that statute if future circumstances warrant its invocation. In my view, however, its application in the circumstances presented by this record was manifestly premature and improper. I therefore respectfully dissent.