■ In the Matter of CHRISTOPHER CUSICK, Appellant, v BERNARD KERIK et al., Respondents. [760 NYS2d 149] —Order, Supreme Court, New York County (Marcy Friedman, J.), entered October 5, 2001, which denied petitioner's application to annul respondents' denial of his application for accident disability retirement benefits, unanimously reversed, on the law, without costs, the petition granted to the extent of remanding the matter to respondents for further proceedings consistent with this Court's decision.

Petitioner, a police officer, fractured his skull on March 15, 1995, when he fell to the ground after escaping from a police van in which he was having difficulty breathing. He had spent 30 to 45 minutes scrubbing the closed van with a toxic cleaning agent. Petitioner is a diabetic. Upon its initial review of his application for accident disability retirement benefits, the Medical Board found that petitioner's line of duty injury resulted from a hypoglycemic attack caused by his underlying diabetes and not from the inhalation of noxious fumes. Upon remand by the Board of Trustees for consideration of new evidence, the Medical Board adhered to its initial finding. Based on its own tie vote on the issue of causation, the Board of Trustees denied petitioner's application for accident disability retirement benefits and petitioner was retired on ordinary benefits (*see e.g. Matter of Starnella v Bratton*, 92 NY2d 836, 838 [1998]). Petitioner claims in this CPLR article 78 proceeding that the Board's determination was arbitrary and capricious (*see* CPLR 7803 [3]). We agree.

Where, as here, the determination of the Board of Trustees is the result of a tie vote, a court may not set aside the denial of accident disability retirement "unless it can be determined as a matter of law on the record that the disability was the natural and proximate result of a service-related accident" (*Matter of Meyer v Board of Trustees*, 90 NY2d 139, 145 [1997] [citation and internal quotation marks omitted]). Thus, the court may not disturb the final award "as long as there was any credible evidence of lack of causation before the Board of Trustees" (*id.*). Credible evidence has been defined as "evidence that proceeds from a credible source and reasonably tends to support the proposition for which it is offered" and is "evidentiary in nature and not merely a conclusion of law, nor mere conjecture or unsupported suspicion" (*id.* at 147 [citations omitted]).

We find that there is no credible evidence that petitioner's loss of consciousness was caused by a hypoglycemic attack and not by his inhalation of the noxious fumes of the cleaning agent. There is no evidence in the record that petitioner has ever before lost consciousness due to his diabetic condition. Letters from physicians who have treated him for diabetes state that he had never had syncope from low blood sugar. Petitioner explained in his line of duty injury report that, like all diabetics, he has had mild hypoglycemia a few times but that "[t]his is not an emergency situation[;] it does not cause you to lose consciousness, it does not cause you to stop working. You treat this by taking some form of sugar or carbohydrate or a glucose pill. The type of Hypoglycemia the [Medical] Board refers to is severe which can cause unconsciousness and even death. I have never experienced this as stated by the three doctors that have treated me for my diabetes * * *. Before the incident I have always been able to feel the warning signs of mild hypoglycemia which for me were shakiness and feeling light-headed. The day of the incident I did not have these symptoms. The symptom I did have was not being able to breath[e] from the overwhelming odor of the fumes."

Petitioner's description of the way he had always reacted to hypoglycemia until after the incident in which he fractured his skull was credited by Dr. Linda Lewis, a neurologist who saw petitioner for a neurological follow-up examination on April 27, 1995. Dr. Lewis reported that "[r]eview of systems reveals a changed ability to detect pending hypoglycemia. Formerly he would get sweaty and light-headed and tremulous. Now only the ankles get the tremulous feeling. This is of concern to him because he cannot anticipate the hypoglycemia."

Dr. Gregory Fried, Executive Chief Surgeon of the New York City Police Department (NYPD), further confirmed petitioner's description in a memorandum dated July 23, 1999, in which he concluded that the evidence established that petitioner's loss of consciousness was caused by inhalation of the fumes. Dr. Fried stated: "Review of the incident and the information reveal no specific evidence that indeed this was not related to the original complaint, namely the exposure to fumes. Generally a 'diabetic attack' which is a non-medical term offered as an explanation, and probably meaning low blood sugar, comes on slowly and gradually. The patients are aware that they are feeling 'woozy' and aware that their blood sugar is falling. Generally if they lose consciousness, it is not a sudden fainting spell, but rather slowly. In addition, the officer has no other evidence of loss of consciousness related to his blood sugar or diabetes before this event and was rather well controlled. To imply from scanty facts that this is not related to the reported line of duty is undefensible and inappropriate * * *. There was no strong evidence with either ketones, low blood sugar or other objective findings that this officer had a diabetic 'attack,' and although one possible scenario, the alternative, namely strong fumes causing a loss of consciousness, is certainly just as valid and appropriate."

In a May 22, 1995 memorandum to the Commanding Officer of the Medical Division, Sergeant Brian Murphy of the Manhattan North Narcotics District stated that on the day of petitioner's accident he and two other police officers used the van that petitioner had cleaned. They went to the van at 4:45 P.M. Petitioner had arrived at the emergency room of Columbia Presbyterian Hospital two hours earlier, at 2:45 P.M., according to the emergency room note. Sergeant Murphy stated: "Upon entering the patrol wagon, the officers were met by a[n] overwhelming odor of disinfectant[.] The Officers immediately opened all doors to the vehicle and activated the front and rear ventilation fans, before exiting the patrol wagon. The Officers remained outside the vehicle for several minutes in order to allow the odor to dissipate * * *. It was evident to the officers that the vehicle had been thoroughly cleaned prior to the officers['] entry."

In his line of duty injury report, petitioner explained that he began cleaning the wagon with the front door open because March 15, 1995 was a warm day. He had not been given the keys for the large rear doors or the ignition key, which was used to operate the ventilation system. When two men appeared outside the van and started talking in loud voices about

the times they had been arrested and ridden in the wagon, petitioner closed the door. "After a while it became extremely warm and the fumes from the cleaner became overwhelming and I could not breath[e]. The last thing I could remember was putting the chains [used to secure prisoners] over my shoulder and trying to get out of the wagon."

The product that petitioner was using to clean the van was "a highly toxic irritant to the respiratory tract," and symptoms of exposure in humans include "cyanosis and loss of consciousness," according to an affidavit of Paul Friedman, Ph.D., Chairman of the Department of Mathematics and Science at Pratt Institute, sworn on March 27, 2000.

In finding that there was credible evidence to support the Board of Trustees' finding of lack of causation, the motion court cited specifically the opinion of Dr. Robert Thomas, Supervising Chief Surgeon, New York City Police Department, that "the probability of having hypoglycemia is pretty considerable if he [petitioner] should undergo some increased physical activity" and that the cleaning was an increased activity. However, petitioner pointed out, without contradiction, that he had never had any problem with hypoglycemia in making more than 200 arrests that involved such "increased activity" as foot chases, entering burning buildings, running up six flights of stairs with a battering ram in his hand and breaking down doors, rescuing people from subway derailments in 110 degree heat, working 16-hour riot shifts, and performing CPR for long periods of time.

The court also listed the facts on which the Medical Board relied and which petitioner claimed were mistaken. The Board found that "had this officer had an acute respiratory reaction to a cleaning agent as is claimed, the officer would not have walked the two blocks that he did, he would have simply exited the van in order to catch his breath." However, the line of duty injury reports signed by commanding officers DI William Taylor and Capt. Donald Hoehl reflect that petitioner was found at the intersection of West 142nd Street and Fifth Avenue, just one short block from West 143rd Street and Fifth Avenue, where the van was parked, and there is no evidence in the record that contradicts this fact. The Board found that EMS administered glucose to petitioner before he was taken to the hospital. However, petitioner pointed out that the EMS records themselves do not document the administration of glucose. In fact, the ambulance call report, which noted that petitioner is insulin dependent, stated that petitioner was found lying on the ground with an open head injury but that EMS was "[u]n-

able to ascertain if pt. was assaulted or syncope." As petitioner pointed out, this call report not only does not indicate that EMS administered glucose to him, but it indicates that EMS did not know what had happened to him, and glucose would not have been administered under those circumstances. Dr. Thomas claimed that he was informed by petitioner's wife that petitioner had previous hypoglycemic episodes. However, petitioner's wife submitted an affidavit in which she stated that her conversation with Dr. Thomas in the emergency room on the day of the accident consisted of his asking her how long petitioner had been a diabetic, to which she responded that it was approximately seven years, and whether petitioner ever had any problems with the disease, to which she responded that he had complete control and always stuck to his diet. Petitioner's wife stated that Dr. Thomas never asked her if petitioner ever had a seizure, but that, in any event, she had known petitioner since before he joined the police force and he had never had a seizure or lost consciousness in all those years.

The court observed that the Medical Board was advised and recited in its report that there was no documentation by EMS of the administration of glucose and that the Board also considered petitioner's evidence of his distance from the van when he was found and petitioner's wife's affidavit as well as hemoglobin A1c reports submitted by petitioner indicating that petitioner "did have tight control of his diabetes." We note, however, that the Board reviewed this evidence for the first time on remand but did not explicitly pass upon its significance (*see Matter of Ahrendt v McGuire*, 82 AD2d 787, 788 [1981] ["There is no indication in this record that the respondents specifically considered this report and rejected the portion alluding to the petitioner's back injury"]). Indeed, it appears that the Board ignored this evidence.

The court found that the Board's finding of lack of causation had support in the hospital records of petitioner's treatment after the incident and a neurological evaluation conducted the day after the incident, "which reached diagnostic impressions of 'hypoglycemic attack with loss of consciousness.' " A review of the hospital records themselves, however, does not support the court's finding. Although the Board stated in its report that the emergency room notes indicate the diagnostic impression was that petitioner had experienced a hypoglycemic attack with loss of consciousness, we can find no such notation on the copy of the emergency room notes in the record. The neurological report, which the Medical Board noted was dated March 16, 1995 and bore an illegible signature, is not contained in the

record at all. However, petitioner addressed this point in his line of duty injury report. He stated that at 11:00 A.M. on March 15, 1995, before leaving home, he took a glucose pill, which was his habitual precautionary measure when he knew he would be eating out and would be unable to control the precise time of the meal. Petitioner continued: "If you read the whole paragraph [in the neurologist's report] you will see that the Neurologist states that I have no history of unconsciousness or seizures and he [says] It was probably due to low sugar. I understand it was difficult for him to make a diagnoses [sic] because I could not communicate at that time [due] to my injuries and inform him of the chain of events. Again my blood sugar was normal."

In fact, Dr. Thomas confirmed for the Board of Trustees that petitioner's blood sugar was within normal limits when he arrived in the emergency room. Petitioner stated in his line of duty injury report that 25 minutes later, his blood sugar, though still normal, had dropped. "This clearly shows no Glucose was given because my sugar level was dropping * * * It was time to eat lunch as I have always done in the past exactly 4 hours after the injection." Nothing in the medical evidence before the Board contradicts this.

The only other documentation of the neurological evaluation in the record is a reference in a memorandum from Dr. Theobald Reich, Deputy Chief Surgeon, NYPD, to the Commanding Officer, Medical Division, Administrative Section, dated June 29, 1999. Dr. Reich stated, "According to the information in the hospital records, [petitioner] 'has had episodes of hypoglycemia.' He took a 'glucose pill' on the date in question. A neurologist who examined [him] in Presbyterian hospital shortly after his admission to the hospital, diagnosed hypoglycemic attack with loss of consciousness." Dr. Reich also stated, in the first paragraph of this memorandum, that petitioner's "altered state of consciousness improved promptly in response to 30 grams of glucose by mouth [administered by EMS]" and in the penultimate paragraph that he and Dr. Martinez, an emergency medicine specialist, "both agree that the only known cause of altered consciousness, e.g. confusion, combativeness, etc., that is relieved promptly by ingestion of sugar is hypoglycemia." Thus, it appears that Dr. Reich's conclusion that it must have been a hypoglycemic attack that caused petitioner to lose consciousness was based on the unfounded assumption that petitioner was given glucose by EMS.

In any event, it appears that the initial diagnostic impression of hypoglycemic attack was based on petitioner's diabetes

and was made before petitioner was able to relate what had happened to him (see Ahrendt, supra at 788 [respondents "should not feel unduly constrained in their approach to this case by a preliminary diagnosis made in an emergency room"]). Dr. Reich's memorandum states, "Sometime latter [sic] [petitioner] ascribed this altered state of consciousness and his fall to being overcome by fluid fumes that used [sic] to clean a patrol wagon." In fact, while Dr. Thomas told the Board of Trustees that he was present when petitioner was in the emergency room and that "[w]e talked to him and at the time most people thought it was due to a hypoglycemic reaction" (emphasis added), the line of duty injury reports signed by DI Taylor and Capt. Hoehl reflect that at the time neither Dr. Thomas nor Dr. Keslie, the attending physician at the hospital, "were able to make a determination as to how or why the officer fell to the ground."

Dr. Thomas acknowledged to the Board of Trustees that there was evidence in the record that fumes can cause a loss of consciousness, but he noted that there was "confusion as to whether he [petitioner] was given sugar." He said petitioner's being given sugar "lend[s] credence to the fact that he might have this hypoglycemic reaction," because when his blood sugar was taken five minutes after he arrived in the emergency room it was within normal limits. Thus, Dr. Thomas's conclusion that petitioner lost consciousness because of a hypoglycemic attack rests, again, on the unfounded assumption that petitioner's blood sugar was normal because he had been given glucose by EMS shortly after the accident, rather than because petitioner had taken a glucose pill earlier in the day.

The motion court concluded that the Medical Board weighed conflicting evidence and resolved the conflict, as it is solely within the Board's province to do. We find that there was no conflicting evidence. The purported evidence that petitioner's loss of consciousness was caused by a hypoglycemic attack wholly lacks evidentiary support and consists instead of "conclusion[s] of law, * * * mere conjecture or unsupported suspicion" (see Meyer v Board of Trustees, 90 NY2d at 147).

Accordingly, we find, as a matter of law, on the record, that petitioner's disability was the natural and proximate result of a service-related accident (id. at 145), i.e., inhalation of fumes from the toxic cleaning agent he used in the van, and that his petition should not have been denied. Concur—Nardelli, J.P., Andrias, Saxe, Ellerin and Lerner, JJ.