Haydee **CARTAGENA**, Plaintiff,

v.

**CITY OF NEW YORK et al., Defendants.**

**No. 99 Civ. 11987(DC).**

United States District Court, S.D. New York.

Nov. 23, 2004.

---

Carroll & Friess, by Rosemary Carroll, Esq., Alan I. Friess, Esq., New York, NY, for Plaintiff.

Michael A. Cardozo, Esq., Corporation Counsel of the City of New York, by Jay Douglas Dean, Esq., Assistant Corporation -Counsel, New York, NY, for Defendants.

## *OPINION*

CHIN, District Judge.

In this case, plaintiff Haydee Cartagena, a police officer in the New York City Police Department (the "NYPD"), challenges the decision of the Board of Trustees (the "Trustees") of the Police Pension Fund (the "Pension Fund"), issued March 12, 2003, awarding her ordinary disability retirement benefits ("ODR") and denying her accidental disability retirement benefits ("ADR"). Cartagena contends that she should have been awarded ADR.

As a consequence of being awarded ODR, Cartagena will receive a pension equal to one-half of her final salary, and the pension is subject to federal income tax. If Cartagena had been granted ADR, she would be receiving instead a pension equal to three-quarters of her final salary that would not be subject to federal income tax.

Cartagena challenges the Pension Fund's decision pursuant to Article 78 of the New York Civil Practice Law and Rules. N.Y. C.P.L.R. 7801 *et seq.* (McKinney 1994 & Supp.2004). For the reasons that follow, the petition is granted and judgment will be entered against defendants[1] directing the Pension Fund to award Cartagena ADR.

## *STATEMENT OF THE CASE*

### A. *The Facts*

Cartagena was appointed a New York City Police Officer on July 16, 1984. She

---

1. In this case, as discussed further below, Cartagena filed both a complaint and a peti-

thereby became a participant in the Pension Fund.

Cartagena suffered two injuries that were the basis for her ADR applications, and she made four separate ADR applications over the years. I discuss the two injuries and the four ADR applications, and in the process I describe the extensive medical treatment she received.

### 1. *Cartagena's First Injury*

On February 23, 1987, while chasing a robbery suspect, Cartagena tripped, sustaining an injury to her right hand. She also felt pain in her legs and torso. (PX A).[2] She was treated at the Kings County Hospital Emergency Room. (PX B). She was placed on Sick Report the same day. (Pet. Br. at 2; PX E).

On March 5, 1987, Cartagena was examined by Dr. Zweig at the request of the NYPD District Surgeon, Dr. Fishbone. (PX C). Dr. Zweig reviewed Cartagena's history and x-rays and diagnosed her with "capsulitis of the MPJ of the right thumb." (*Id.*). He recommended splinting the MPJ of the right thumb for about three weeks, to be followed by range of motion exercises. (*Id.*).

On March 17, 1987, Cartagena was restored to Limited Duty. (Pet. Br. at 2; *see* PX C at 3). She was seen several more times by Dr. Zweig. (*See* PX C). By June 1987, Dr. Zweig was recommending surgery. (*See id.* at 4; PX D). In July 1987, Dr. Zweig filled out a Workers Compensation Board form stating that Cartagena was totally disabled. (PX C at 5–6).

Thereafter Cartagena was seen by various consultants. (PX D). On August 17, 1987, a consultant diagnosed Cartagena's injury as "Right thumb MP joint dislocation & ligamentous injury—Both radial and ulnar collateral ligaments involved." (*Id.* at F00967). He recommended "MP joint fusion" of the right thumb and stated that Cartagena was capable of "Restricted duty." (*Id.*). In November 1987 another consultant reached similar conclusions, although he also noted that the prognosis was "Fair to Good for full recovery." (*Id.* at F00966).

Cartagena sought a second opinion from Dr. Neumann, who examined her on June 7, 1988. Dr. Neumann agreed that some form of surgery, although not a fusion, would be helpful. (PX F). He suggested that an EMG be done first, and one was done by Dr. Mazurek. (*Id.*). Dr. Mazurek characterized the EMG results as "abnormal" and diagnosed bilateral carpal tunnel syndrome, left greater than right. (*Id.*). In December 1988, Dr. Neumann recommended surgery. (*Id.*).

### 2. *The First ADR Application*

On January 6, 1989, Cartagena filed an application for ADR. (DX 3). On April 19, 1989, in connection with her ADR application, Cartagena was examined by the Medical Board of the Police Pension Fund (the "Medical Board"). Three physicians conducted the examination and reviewed "all evidence in the medical folder." (PX G).

The Medical Board recommended that Cartagena's ADR application be "disapproved," concluding that it did "not find sufficient objective medical evidence to substantiate the presence of a permanent disability which would prevent the performance of full duty based on muscular

---

tion and she is both a "plaintiff" and a "petitioner." I will refer to her as "Cartagena." Likewise, defendants are both "defendants" and "respondents." I will refer to them as "defendants."

**2.** References to "PX" and "DX" are to the exhibits to Cartagena's petition and defendants' answer to the petition, respectively.

skeletal condition involving the right wrist or thumb." (*Id.*).

On September 5, 1989, Dr. Mazurek submitted a report advising that he had re-evaluated Cartagena and setting forth his findings. He concluded that she still had significant symptoms of pain and weakness and that there was "a positive Tinel's sign bilaterally." He noted that these findings were consistent with bilateral carpal tunnel syndrome and acknowledged that "this alone was not the explanation of all of Mrs. Cartagena's symptoms." He concluded that "clearly, the right hand dysfunction is related to ligamentous and mechanical injuries as well." (PX H).

On September 20, 1989, the Commanding Officer of the Pension Section remanded the matter to the Medical Board for reevaluation based on new evidence. (DX 5).

On October 16, 1989, the Medical Board reviewed the new evidence, consisting of Dr. Mazurek's September 5, 1989 report, and interviewed and examined Cartagena. The Medical Board reaffirmed its prior decision and again recommended disapproval of the application. (PX I).

### 3. *Cartagena's Second Injury*

On November 1, 1989, while on restricted duty at police headquarters at One Police Plaza, Cartagena was instructed to investigate a tripped alarm on the roof of the building. She pushed the door with both hands to determine if it was secure. The door was difficult to open and more than the usual force was required to open it. When she pushed, Cartagena felt a sharp pain in both her hands, her right arm, and her neck area. (PX J). She was treated at Downtown Beekman Hospital. (*Id.*). The injury was considered a line-of-duty injury. (*Id.*).

On November 15, 1989, Dr. Mazurek conducted another EMG. He concluded that the EMG was "normal" and that "there is now no electrical evidence for radiculopathy or neuropathy." (DX 8). He also added: "Evidently, Mrs. Cartagena's bilateral carpal tunnel syndrome has improved, as has her neuropathy." (*Id.*).

Cartagena was seen by a consulting neurologist, Dr. Dimancescu, on December 21, 1989. His diagnostic impression was bilateral upper extremity polyneural and polyradicular symptom complex, possibly representing a cervical spinal cord dysfunction. He ordered cervical spine x-rays and an MRI. (PX K). The MRI showed mild disc bulges at C3–4 and C4–5, with no evidence of cord impingement. (*Id.*).

Cartagena was seen by Dr. Dimancescu again on February 15, 1990. His impression was polyneural and polyradicular symptom complex with no cord compression. Cervical spine x-rays and a cervical MRI taken on January 30, 1990 were normal. (PX M at 2).

On April 20, 1990, as set forth in a report dated April 24, 1990, Dr. Battista saw Cartagena in neurological consultation. Cartagena described to him both the February 23, 1987 and the November 1, 1989 injuries. Dr. Battista concluded:

"[A]ll the muscle groups function quite well; with repeated movements, it appears that the muscles of the hand innervated by the ulnar and median nerve [become] somewhat stronger, but certainly they are much weaker than normal, with the right being slightly weaker than the left." (PX L). Dr. Battista reported a good radial pulse in the upper right extremity and less of one in the upper left extremity. (*Id.*). He noted that he needed to see the results of the various tests that had been administered to Cartagena. (*Id.*).

By letter dated May 29, 1990, Dr. Battista provided an additional report, based on his review of the various test results, including Dr. Mazurek's EMG. He concluded that "[t]he prolongation of the ulnar nerve conduction is not characteristic of carpal tunnel syndrome, but supports an ulnar neuropathy." (PX N).

On June 21, 1990, the Commanding Officer of the Pension Section remanded the matter to the Medical Board for another reevaluation, again based on new evidence. (DX 9).

On July 20, 1990, the Medical Board reviewed the new evidence, which included the documents relating to the November 1, 1989 injury, the reports of Drs. Dimancescu and Battista, and the January 30, 1990 MRI, and also interviewed and examined Cartagena. The Medical Board reaffirmed its prior decision and again recommended disapproval of the application, concluding that there was insufficient evidence of disability. (PX M).

On September 28, 1990, Dr. Battista saw Cartagena again and he wrote a report dated October 2, 1990. (PX N at 358). He noted that she was complaining of pain in both hands, over the joints of the thumbs and the palms of both hands. She also complained of headaches and some neck pain. He stated that "[a] conservative approach is indicated." (*Id.* at 358).

On February 1, 1991, as reflected in his report dated February 4, 1991, Dr. Battista saw Cartagena again. (*Id.* at 336). She continued to complain of pain in both hands and of headaches, which she stated had become more severe. He reported that EMGs done on January 7, 1991 showed "no real specific findings indicating either peripheral neuropathy or radiculopathy in the cervical neural components." (*Id.*).

On May 3, 1991, as reflected in a report dated May 10, 1991, Cartagena was seen by a rheumatologist, Dr. Dimant. (PX N). He reviewed her history and examined her. He stated that "the patient was noted to have Raynaud's phenomenon in both hands, which slowly subsided." He ordered x-rays and tests. (*Id.*).

Dr. Dimant saw Cartagena for a follow-up visit on June 7, 1991. (PX N at 341). She continued to complain of pain in both hands and wrists, radiating to the elbows, as well as a burning sensation in the palms of her hands. An EMG performed on May 24, 1991 was within normal limits. The x-rays of both hands showed no juxtaarticular osteoporosis, joint space narrowing, or erosions. There was evidence of tenosynovitis in both wrists. There was no evidence of a systemic rheumatic disease. (*Id.*).

On June 18, 1991, Dr. Tobin saw Cartagena for tenosynovitis of both wrists. He concluded that this was a "chronic condition" but did not feel that it was operable. (PX N).

On August 1, 1991, Cartagena was seen by Dr. Shebairo, an orthopedist. (PX N). He concluded:

> It is my opinion that Ms. Cartagena is totally disabled because of bilateral upper extremity involvement; the patient has [been] employed as a New York City police officer and in my opinion, the patient is totally permanently disabled and cannot return to the duties of a police officer in any capacity.

(*Id.* at F00926).

On September 20, 1991, as reflected in his letter dated September 24, 1991, Dr. Battista saw Cartagena again. (PX N at 334). She continued to complain of pain in both hands and of headaches. Dr. Battista requested an MRI of the brain. One was

done on November 15, 1991, and was negative. (PX N).

Dr. Battista saw Cartagena again on January 3, 1992, as reflected in his report dated January 6, 1992. (PX N at 332). She described "a strange feeling and pain" in both hands. She stated that she had headaches, "which may come and go," and which were not as severe as before. He felt that "a conservative approach is indicated," and observed that "the exact etiology of the patient's symptoms is not clear." (*Id.* at 332–33).

On February 6, 1992, Cartagena was seen by Dr. Stuchin. (PX N at F00912). Cartagena complained of pain throughout her hand in a variety of anatomic locations. Dr. Stuchin's impression was deQuervain's disease with overlying radiosensory neuritis. He saw her again on April 13, 1992, and noted that her bone scan was normal. His impression again was deQuervain's. (PX N at [3]28). He saw her again on May 4, 1992, and noted the following:

> [The condition] may resolve spontaneously, or persist for an indeterminate period of time. With treatment, this condition can usually be expected to resolve. This condition is not progressive, and does not, in and of itself, cause problems in other parts of the hand or other joints. At this point the patient is disabled.

(PX N at 327).

On May 28, 1992, as reflected in his report dated June 1, 1992, Dr. Dimant saw Cartagena again. (PX N at F00911). He reported:

> The findings of joint examination were essentially similar to the findings a year ago. The DIP, PIP and MCP joints were normal bilaterally. The dorsal aspects of both wrists showed local heat swelling and tenderness. There was flexion tenderness in both wrists. There was swelling and tenderness along the

extensor pollicis longus bilaterally. There was slight atrophy of the hypothenar muscles bilaterally, but no intrinsic muscle atrophy. There was weakness of both hands but no sensory loss. P.O. Cartagena continues to have bilateral tenosynovitis.

(*Id.*).

On June 29, 1992, the Commanding Officer again remanded the matter to the Board for reevaluation based on new evidence. (DX 11).

On July 7, 1992, Cartagena was examined by Dr. Lanzone in another orthopedic consultation, as reported in his letter dated September 22, 1992. (PX N). The examination showed bilaterally positive Phalan tests suggestive of carpal tunnel syndrome. An MRI was positive for a central and right sided disc herniation at C5–6. Dr. Lanzone felt that Cartagena should undergo a carpal tunnel release of the right hand. (*Id.*).

On October 14, 1992, the Medical Board issued a report. It reviewed the new evidence and examined Cartagena again. The Medical Board wrote:

> Based on the above physical examination, it is the opinion of the [Medical] Board that despite multiple subjective complaints and restrictions, there are no hard objective physical findings to substantiate a disability that would prevent the performance of full police duty.

(DX 12). The Medical Board deferred making a final decision, however, because it was awaiting the film and report for an MRI that had been performed on the cervical spine. (*Id.*).

On November 13, 1992, noting that it had received the report for an August 7, 1992 MRI, the Medical Board concluded that "[t]he documented as well as the clinical evidence does not substantiate the offi-

cer's claim of disability." (DX 13). The Medical Board recommended that Cartagena's application for an ADR be disapproved. (*Id.*).

On February 9, 1993, Cartagena was examined by Dr. Grad, a consulting orthopedic hand surgeon. (PX Q). He found the neurocirculatory status of both hands to be intact, with a full range of motion of the wrist and fingers. There was a mildly positive Finkelstein's sign bilaterally, and slight tenderness overlying the thumb along the course of the extensor tendons and overlying the dorsum of the wrist capsule. Radiographs were normal. Dr. Grad's impression was bilateral synovitis of the wrist, along with mild deQuervain's tendonitis. (*Id.*).

On May 26, 1993, Dr. Lanzone diagnosed Cartagena with right cervical radiculopathy and carpal tunnel syndrome. (PX Q at 2). He recommended carpal tunnel release. (*Id.* at 3).

By memorandum dated November 16, 1993, the Commanding Officer of the Pension Section advised Cartagena that the Trustees had denied her application for an ADR at a meeting on November 10, 1993. (DX 14). This was her first application, submitted on January 6, 1989. (*Id.*).

#### 4. *The Second ADR Application*

On January 7, 1994, Dr. Grad performed surgery on Cartagena for:

1. Compression neuropathy median nerve at the left carpal tunnel

2. Compression of the left radial nerve in the distal forearm and wrist

3. Stenosing tenosynovitis abductor pollicis longus and extensor pollicis brevis

4. Chronic tendinitis left wrist.

3. This surgery, as well as the other surgeries discussed below, were paid for by the NYPD

(PX Q at PC 0215).[3] Following the surgery, Cartagena participated in a physical therapy program to strengthen her left hand. (*Id.* at 9).

On May 24, 1994, Cartagena filed another application for ADR, based on her complaint of internal derangement to the right hand and wrist and left hand and wrist as well as neck herniation with nerve damage, based on line-of-duty injuries on February 23, 1987 and November 1, 1989. (DX 16).

On June 17, 1994, Cartagena underwent a second surgery, performed by Dr. Grad, for:

1. Compression neuropathy median nerve at the right carpal tunnel

2. Compression neuropathy radial nerve right wrist

3. Chronic flexor tendinitis right wrist

4. Stenosing tenosynovitis abductor pollicis longus and extensor pollicis brevis right thumb.

(DX 17).

On June 23, 1994, Cartagena was examined by Dr. Weinman, who diagnosed her with a C3–4 disc herniation with radiating pain from the right neck to the right shoulder region and status post carpal tunnel release. (PX R at 17).

On July 30, 1994, Cartagena went to Massapequa General Hospital complaining of severe neck pain. (*Id.* at 11). She was diagnosed with cervical strain. (*Id.* at 12).

Dr. Weinman prepared additional reports dated September 14, October 17, November 16, December 19, 1994, and April 25, 1995. (PX R at 18–26). She summarized her findings on physical examination and gave her diagnoses. (*Id.*). Cartagena received physical and occupational therapy. (*Id.*).

as the injuries were considered in the line of duty. (Pet. Br. at 20).

As reported in his letter dated August 31, 1995, Dr. Monsanto examined Cartagena on April 11, 1995. (PX S at 3). He diagnosed her with cubital tunnel syndrome bilaterally, bilateral carpal tunnel syndrome, bilateral deQuervain's tendonitis, and bilateral volar ganglion cysts. (*Id.* at 4). He was of the view that Cartagena had a permanent moderate to severe disability with a long term prognosis that was "not good." (*Id.*). He also believed that it was "unlikely that she is going to get any additional strength with therapy or further surgery." (*Id.*).

On September 20, 1995, Cartagena was examined by Dr. Zackin, who concluded that she suffered from weakness of both hands and wrists and pain with persistent symptoms of both median and ulnar nerve entrapment in the carpal tunnel and Guyon's canal, bilaterally. He also found evidence of deQuervain's syndrome, bilaterally. (PX S at 5). He concluded: "I feel that this patient is permanently disabled and should be considered for medical retirement." (*Id.*).

On November 13, 1995, the Medical Board issued another report after examining Cartagena again. (PX T). The Board concluded: "Based on the lack of objective clinical findings and the officer's cooperation during the examination, the ... Medical Board recommends disapproval of the officer's own application for [ADR]." (*Id.*). The Medical Board also noted that the Police Commissioner had directed that an application for ODR be submitted for Cartagena, and the Medical Board recommended that the Police Commissioner's application for ODR be disapproved as well. (*Id.*).

On November 29, 1995, Dr. Monsanto performed surgery on Cartagena for compression ulnar nerve at wrist, left side. (PX U). He continued to treat her thereafter, providing reports dated December 27, 1995, March 29, 1996, May 1, 1996, and October 8, 1996. (*Id.*; PX W) Dr. Monsanto was of the view that Cartagena was disabled, and that her medical conditions were related to her work. (PX U).

On March 29, 1996, Dr. Monsanto wrote the following: "Ms. Cartagena is my patient. She has multiple medical problems and I believe they are all related to her accident at work." (PX U at 249).

On April 9, 1996, Dr. Zackin provided another report. He stated his view that Cartagena's condition was "worsening" and that she was "permanently disabled." (PX U at 246). He added: "She is unable to perform the normal duties of a Police Officer and should be considered for medical disability retirement." (*Id.*).

On May 20, 1996, after considering additional evidence, the Medical Board examined Cartagena again and issued another report. (PX V). The Medical Board reaffirmed its prior decision "disapproving" of Cartagena's application for ADR and the Police Commissioner's application for ODR. (*Id.*).

Dr. Zackin continued to treat Cartagena, and he issued a report dated September 9, 1996. (PX W). He reported that her symptoms were progressive and appeared to be increasing in intensity. He wrote: "There is no question that her condition is worsening. P.O. Cartagena is permanently disabled and is totally unable to perform her normal duties as a police officer. She should be retired on medical disability." (*Id.*). After examining her again on January 8, 1997, he wrote a similar report reaching the same conclusions. (*Id.* at 2).

Dr. Monsanto also continued to treat Cartagena, as reflected in his report dated October 8, 1996. (PX W at 5). He diagnosed her with cubital tunnel syndrome, bilaterally, and he recommended a surgical release. (*Id.* at 6). Dr. Monsanto re-

ferred Cartagena for hand therapy on December 20, 1996, and she started therapy at Park Slope Occupational Therapy. (*Id.* at 3).

On January 8, 1997, Dr. Zackin wrote a report, concluding: "P.O. Cartagena is permanently disabled and is totally unable to perform her normal duties as a Police Officer. She should be retired on medical disability." (DX 23).

On January 13, 1997, after again considering new evidence, the Medical Board examined Cartagena again, reviewed the additional medical evidence, and concluded that "this officer is able to perform the full duties of a New York City police officer." The prior decisions to disapprove both ADR and ODR were reaffirmed. (PX X).

On April 30, 1997, Cartagena was re-evaluated at Park Slope Occupational Therapy. The report noted that she had been attending therapy on a weekly basis since January 1997. The report concluded that:

> Patient displays gross deficits in strength and moderate sensory loss. In the right dominant hand, patient is unable to lift everyday objects or write for any length of time. Patient has not been able to return to full duty as a police officer.... She is now discharged from hand therapy. As patient has failed with traditional therapy techniques, a referral to a specialized pain management team is appropriate.

(PX Y at 3).

On May 7, 1997, Dr. Monsanto wrote a letter stating that "Cartagena has undergone multiple procedures on her hands for her injuries but is still totally disabled." (PX Y at 8).

On May 14, 1997, as set forth in a letter dated May 22, 1997, the Trustees denied Cartagena's second application for disabili-ty retirement (submitted May 24, 1994). (*See* DX 25).

### 5. *The Third ADR Application*

On September 17, 1997, Cartagena submitted another application for ADR, her third, again based on the February 23, 1987 incident. (DX 26).

On October 27, 1997, the Medical Board again examined Cartagena and considered new evidence and again concluded that Cartagena "can perform the full duties of a New York City Police Officer." (PX Z). The Medical Board again recommended disapproval of both ADR and ODR. (*Id.*).

On November 17, 1997, Dr. Mazurek wrote that Cartagena "is still having symptoms and is completely and totally disabled." (PX AA).

On February 27, 1998, Dr. Monsanto wrote a report concluding that Cartagena was "still disabled" and was "unable to perform the usual duties of a police officer." (PX EE at 2). He also wrote: "Her long term prognosis is not good." (*Id.*).

On March 16, 1998, the Medical Board again examined Cartagena and considered new evidence and again recommended disapproval of both ADR and ODR. (PX BB).

On July 29, 1998, Cartagena was examined by Dr. Yellin, a neurologist, who concluded: "Chronic pain & some cervical radiculitis. History is suggestive of associated reflex sympathetic dystrophy." (PX CC at 1). An EMG and nerve conduction study were performed. (*Id.*).

On September 17, 1998, an MRI was performed on Cartagena's cervical spine. It showed "mild abnormal cervical kyphosis," disc bulges "without significant neural foraminal narrowing," and a right paracentral C5–6 disc bulge. (PX CC at 10).

On November 6, 1998, Cartagena was required, apparently by the Medical Division, to fire a weapon at the firearms

range. She had difficulty pulling the trigger. She fired only one round (of 50) and dropped the weapon to the ground. She was marked "Failed To Qualify." (PX CC at 8). She was thereafter charged by the NYPD with failing and neglecting to comply with an order and suspended. (*Id.* at 9).

On November 9, 1998, the Medical Board again examined Cartagena and considered new evidence, including the EMG, nerve conduction study, and MRI. It again disapproved both ADR and ODR. (PX DD).

On November 19, 1998, as discussed in a report dated November 21, 1998, Cartagena was examined by Dr. Lefkowitz. (PX EE at 8). His impression was "S/P carpal tunnel repair. Hand pain secondary to a neuropathic process involving the left ulnar nerve." (*Id.* at 9).

On November 27, 1998, Dr. Yellin wrote another report. (PX EE at 10). He wrote:

In conclusion, Ms. Cartagena has had chronic long-term problems with the cervical spine and both upper extremities. She has undergone multiple surgeries and has seen multiple physicians over the course of the past eleven years. Multiple physicians have found her disabled in her occupation as a Police Officer. She is at present, suffering carpal tunnel syndrome, as well as cervical radiculitis. Her symptom complex and history indicate the presence of reflex sympathetic dystrophy.

It remains obscure why the Police Command felt it necessary to send her to a firing range to re-qualify with firearms, despite the multiple medical reports indicating that she was disabled, and despite they, themselves, removing her firearms at least ten years previously. This has exacerbated her condition and put her life, as well as the life of fellow police officers and the civilian population at risk. She is currently disabled in her occupation as a Police Officer, in view of the duration of her symptoms, this disability is permanent.

(PX EE at 13–14).

On December 3, 1998, Dr. Lefkowitz wrote that Cartagena's hands were swollen and that she was "unable to fire a weapon or [take] any police action that would require [use of] her hands." (PX EE at 16).

On December 7, 1998, Dr. Zackin saw Cartagena and wrote:

This patient has a sympathetic dystrophy of both hands and wrists, that if anything, has worsened since my last examination of her in January 1997. She is unable to fire her weapon and cannot perform the duties of a police officer as required. She is permanently disabled and should be retired on medical disability.

(PX EE at 17).

On February 10, 1999, as reflected in a letter dated February 19, 1999, the Trustees denied Cartagena's third application for disability retirement (dated September 17, 1997). (*See* DX 33).[4]

### 6. *The Fourth ADR Application*

On August 17, 1999, Cartagena was seen for the first time by Dr. Fietti, an orthopedist and hand surgeon. He reviewed a number of medical reports. He wrote:

It is now 12 years since this lady's injury and apparently there has been no improvement in this time. Surgery was not carried out until 7 years after the

---

**4.** On March 13, 1999, while on duty, Cartagena fell from a chair and sustained injuries to her head, neck, left wrist, and arm. (DX 34). These injuries apparently were not serious, as this incident was not the basis of any disability application.

injury which suggests to me that the diagnosis and causal relationship was not very clear, even to her treating physicians. And indeed subsequent to the surgery of 1994 and 1995 there was very little if any improvement. . . .

I think that the prognosis here is extremely poor given the 12 year history and the apparent[ ] lack of improvement over this time. . . . The likelihood of her recovering is extremely poor and I would concur with some of her other treating physicians that she should be considered disabled on a permanent basis.

(PX EE at 19).

On September 29, 1999, Cartagena applied again for ADR, based on the February 23, 1987 and November 1, 1989 incidents. (DX 35).[5]

In June and July 2000, a departmental disciplinary trial was held on the charge that Cartagena wrongfully failed to qualify with a firearm. (Pet. Br. at 15). The NYPD advocate represented that he had been told by Dr. Panovich, a member of the Medical Board and a member of many of the panels that had considered Cartagena's applications, that it was his opinion that Cartagena was "malingering." (PX QQ; see Pet. Br. at 15–16). The charge was dismissed. (Pet. Br. at 20 n. 8).

The Medical Board met again on September 25, 2000 and November 6, 2000, continuing to consider (or reconsider) Cartagena's application. (PX FF). In the September 25, 2000 report, the Medical Board wrote:

The officer's symptoms sound somewhat like a Raynaud's phenomenon. Both hands are somewhat cool, certainly as

compared with her feet. She states that the cold affects it. It turns blue when she goes outside in the cold and when she comes back i[n], she feels somewhat better. She uses gloves most of the time. The . . . Medical Board has decided to defer this officer case at this time to obtain the copies of the bone scan that was supposedly done.

(Id. at 3). In the November 6, 2000 report, the Medical Board again deferred, in part so that a bone scan could be repeated. (Id. at 5).

On November 15, 2000, Cartagena had a bone scan, which was normal. (PX GG).

On December 18, 2000, the Medical Board met again to consider Cartagena's case. It reviewed the results of the bone scan as well as other materials and concluded that Cartagena "does have a Raynaud's syndrome of her hands which is disabling to her," and therefore recommended approval of ODR. It recommended disapproval of ADR. (PX HH). In other words, the Medical Board concluded for the first time that Cartagena was disabled but it also concluded that the disability was not service-related. (Id.). The Medical Board did not explain why it was approving ODR but not ADR. (Id.).

On March 13, 2001, Dr. Monsanto wrote a letter stating his belief that Cartagena's Raynaud's disease was "work related." (PX II).

On April 30, 2001, the Medical Board considered Dr. Monsanto's report, but adhered to its prior decision that Cartagena was disabled but that the disability was not related to a line-of-duty injury. (PX JJ). The Medical Board did not, however,

---

5. On January 13, 2000, while on the subway going to an assignment, she was sexually abused by a man. She identified herself as a police officer and arrested him, taking him off the subway train. In the process, she suffered pain and weakness in both hands and arms. (DX 36). Likewise, these injuries apparently were not serious, for this incident was not the basis of any disability application.

explain why it was rejecting Dr. Monsanto's opinion or why it concluded the disability was not service-related. (*Id.*).

On September 25, 2001, Dr. Monsanto wrote again, stating his belief again that Cartagena's disability was work-related. (PX KK).

On March 25, 2002, the Medical Board considered Cartagena's application again and adhered to its decision to approve ODR but not ADR. (PX LL). Again, the Medical Board did not explain its reasons for rejecting Dr. Monsanto's opinion or finding no causation. (*Id.*). The only hint of any reasoning is the statement that "[t]he tests that were requested by the Board previously, which included the collagen testing and lupus testing, these tests were re-reviewed and were essentially normal." (*Id.* at 2).

On June 26, 2002, Dr. Zackin wrote a report, stating as follows:

> The patient's symptoms appear to have worsened since I saw her last in December 1998. She is unable to fire her weapon and cannot perform the duties of a police officer as required. She is permanently disabled and should be retired on medical disability. This disability appears to be directly related to her LOD injury of 2–23–87, as she was asymptomatic prior to being injured.

(PX MM).

On August 14, 2002, at a hearing on Cartagena's case, the Trustees discussed the subject of Raynaud's disease. (DX 45). At the hearing, Dr. Robert Thomas[6] testified. He explained:

> Actually, I looked into this case and I think the Medical Board at one point made an error when they talked about Raynaud's disease.

Raynaud's disease, let me just talk about the Raynaud's phenomenon. That's a phenomenon in which the hands get cold or the feet. They get cold, they can turn blue, turn white. If you heat them up, they usually get red.

> It is believed that this is caused by the increased activation of the sympathetic nervous system which is supplying that particular extremity.

> Raynaud's disease is an exclusionary type when you don't find a secondary cause for a phenomenon. So in the latest textbook, 2002 Harrison's, they talk about the primary or idiopathic, which is not her case.

> Under secondary, it appears that this person has several reasons for having Raynaud's phenomenon, which includes carpal tunnel. She had bilateral carpal tunnel syndrome.

> She has had trauma, the most common cause is vibration, but she also had certainly reason, I think she has had at least six surgeries on various parts of her upper extremities.

> She has had surgery, she has had treatment, she has had carpal tunnel syndrome, all of which might be the cause of the Raynaud's phenomenon.

(*Id.* at 4). Dr. Thomas provided a page from the textbook to which he referred, which indicated that Raynaud's phenomenon often occurred in patients who used vibrating hand tools, such as chain saws or jack hammers, or in pianists and typists, or as the result of electric shock injury. (*Id.* at 6). The matter was remanded. (*Id.* at 5).

On September 30, 2002, the Medical Board again considered Cartagena's case. It reaffirmed its prior decision to approve ODR and disapprove ADR. It apparently rejected the suggestion that Cartagena

---

**6.** Dr. Thomas was Medical Consultant to the Trustees. (Pet. Br. at 24).

had suffered from carpal tunnel syndrome, noting that carpal tunnel syndromes usually result not from single trauma but from repetitive motion traumas. It also noted that Cartagena's surgeries had not given her any relief when carpal tunnel surgery has a high percentage of total relief and results in substantial relief even when there is not total relief. The Medical Board concluded that the final diagnosis was "Raynaud's Syndrome Both Hands." (PX OO).

On December 5, 2002, as reflected in a report dated December 6, 2002, Cartagena was examined by Dr. Robert A. Greenwald, a professor of medicine at the Albert Einstein College of Medicine. He concluded: "The patient does not have true (disease) Raynaud's. Her putative atypical circulatory problems are post-traumatic in origin." (PX PP). He stated his belief that Cartagena had symptoms that "mimic[ked]" Raynaud's disease and noted that "[t]he patient's Raynaud's phenomenon is atypical and there is no evidence that it is due to disease. Post-traumatic circulatory problems ... [are recognized] as a well-known cause of secondary Raynaud's." (*Id.*).

On December 11, 2002, the Trustees held a hearing on Cartagena's case and noted that the Medical Board had "reaffirm[ed] approval of ordinary disability, accident denied." (DX 47 at 3). The Trustees tabled the matter. (*Id.*). On January 8, 2003, the same transpired. (*Id.* at 6). On February 12, 2003, the same transpired. (*Id.* at 9).

On March 12, 2003, the Trustees met again and finally made a decision. It "[s]o moved" the Medical Board's recommendation to grant ODR but deny ADR. (*See* DX 48; Def. Counsel's Letter dated 6/29/04). No analysis or reasoning was stated on the record. (DX 48 at 3).

## 2. *Prior Proceedings*

Cartagena commenced this action in 1999 alleging discrimination in the terms of her employment as a police officer in violation of federal, state, and city law. The proceedings were delayed on several occasions pending a decision by the Medical Board and the Trustees on Cartagena's application for ADR. After the Trustees rendered its final decision in March 2003 granting her ODR but denying ADR, Cartagena sought leave to file an Article 78 petition to challenge the decision.

Defendants initially argued—and the Court agreed—that an Article 78 claim could only be brought in state court. *See Cartagena v. City of New York*, 257 F.Supp.2d 708 (S.D.N.Y.2003). I held that I did not have the power to exercise jurisdiction over the Article 78 claim. That decision, however, was issued when defendants objected to this Court's jurisdiction to hear the Article 78 claim. 257 F.Supp.2d at 710. Defendants thereafter withdrew their objection, and they unequivocally agreed, in the unusual circumstances of this case, to the submission of the Article 78 claim to this Court. (*See* 4/22/03 Tr. at 19–20, 23–24).

To avoid the inefficiencies that would result from parallel state and federal litigation, and as both sides consented, the Court agreed to exercise supplemental jurisdiction over the Article 78 claim. *See Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 864–65 (2d Cir.1988) (affirming district court's exercise of jurisdiction over Article 78 proceeding where the issues raised went to "very essence" of consent decree previously entered by the district court). Significantly, the Court had subject matter jurisdiction over the action because Cartagena had asserted a federal claim under Title VII in her complaint.

By stipulation dated March 24, 2004 and so ordered by the Court on April 2, 2004, the parties settled the claims asserted in her complaint, i.e., the discrimination claims under Title VII and state and city law, by agreeing that Cartagena would submit a claim as a member of the class in *Latino Officers Ass'n v. City of New York*, 99 Civ. 9568 (S.D.N.Y. filed Sept. 9, 1999). The parties further agreed that this Court would decide the Article 78 claims and that the Court therefore would retain jurisdiction over the claims asserted in the Article 78 petition.

The Article 78 petition is now before the Court.

## DISCUSSION

### A. *Applicable Law*

■ The parties agree on the applicable legal standard: in reviewing a decision of the Trustees to grant a police officer ODR but deny her ADR, the Trustees' determination that the officer's disability was not caused in the line of duty must be upheld as long as there is "any credible evidence of lack of causation." *See Meyer v. Board of Trustees*, 90 N.Y.2d 139, 659 N.Y.S.2d 215, 219, 681 N.E.2d 382 (1997) (fire department case). (*See* Def. Counsel's Letter dated 6/29/04; Pet. Br. at 19). The reviewing court may not set aside the Trustees' denial of ADR "unless 'it can be determined as a matter of law on the record that the disability was the natural and proximate result of a service-related accident.'" *Meyer*, 659 N.Y.S.2d at 219, 681 N.E.2d 382 (*quoting Canfora v. Board of Trustees*, 60 N.Y.2d 347, 469 N.Y.S.2d 635, 637, 457 N.E.2d 740 (1983)).

The First Department has recently reiterated that "credible evidence" is " 'evidence that proceeds from a credible course and reasonably tends to support the proposition for which it is offered' and is 'evidentiary in nature and not merely a conclusion of law, nor mere conjecture or unsupported suspicion.' " *Cusick v. Kerik*, 305 A.D.2d 247, 760 N.Y.S.2d 149, 150 (1st Dep't 2003) (*quoting Meyer*, 659 N.Y.S.2d at 220, 681 N.E.2d 382).

### B. *Application*

■ From the date of her first accident, February 23, 1987, through December 5, 2002, Cartagena saw at least 18 doctors who can be identified from the record, not counting the doctors who sat on the various Medical Board panels. None of these 18 doctors opined that Cartagena was not disabled or that her disability was not service related.[7] Many of these doctors did not opine on the issue of whether Cartagena was disabled, but even they noted that Cartagena suffered from medical problems.

Many of the treating and examining physicians opined over the years that Cartagena was permanently disabled and could not perform the duties of a police officer. As early as August 1, 1991, Dr. Shebairo, an orthopedist, wrote that Cartagena "is totally permanently disabled and cannot return to the duties of a police officer in any capacity." (PX N at F00926). On May 4, 1992, Dr. Stuchin wrote Cartagena "is disabled." (PX N at 327). On August 31, 1995, Dr. Monsanto wrote that Cartagena had a permanent moderate to severe disability. (PX S at 4). On September 20, 1995, Dr. Zackin wrote

---

7. Not included among these 18 are a consultant whose signature is illegible who wrote on August 17, 1987 that Cartagena was capable of "Restricted Duty" and who also wrote in November 1987 that Cartagena's prognosis was "Fair to good for full recovery." (PX D at F00967, F00966). Of course, this was early on and even this consultant thought that surgery might be required.

that Cartagena "is permanently disabled and should be considered for medical retirement." (PX S at 5). Dr. Monsanto wrote on May 7, 1997 that Cartagena "is still totally disabled." (PX Y at 8). On November 17, 1997, Dr. Mazurek wrote that Cartagena "is completely and totally disabled." (PX AA). On November 27, 1998, Dr. Yellin wrote that Cartagena "is currently disabled [and] this disability is permanent." (PX EE at 14). On August 17, 1999, Dr. Fietti wrote that "I would concur . . . that [Cartagena] should be considered disabled on a permanent basis." (PX EE at 19).

The views of these seven physicians were corroborated by other medical evidence. The other doctors who did not opine on whether Cartagena was disabled confirmed that she suffered from some kind of injury. In addition, Cartagena had at least three surgeries: on January 7, 1994, June 17, 1994, and November 29, 1995. (PX Q at PC 0215; DX 17; PX U). Again, the record does not contain any opinion of a doctor—other than the doctors on the various Medical Board panels—to the effect that Cartagena was *not* disabled.

Yet, despite this record, the Medical Board repeatedly found that Cartagena was not disabled and was capable of performing the duties of a police officer, from April 19, 1989 through November 6, 2000—eleven times over the course of more than eleven years. (*See* PX G (4/19/89); PX I (10/16/89); PX M (7/20/89); DX 12 (10/14/92); DX 13 (11/13/92); PX T (11/13/95); PX V (5/20/96); PX X (1/13/97); PX Z (10/27/97); PX BB (3/16/98); PX DD (11/9/98)). The Medical Board met two more times without reaching a decision. (PX FF (9/25/00, 11/6/00)). It was not until December 18, 2000 that the Medical

Board finally acknowledged that Cartagena had a disabling condition. (PX HH). Even then, the Medical Board refused to recommend approval of ADR. (*Id.*). The Medical Board did not, however, explain its reasoning for not recommending approval of ADR. (*Id.*).

The issue now before the Court is not, of course, whether Cartagena is permanently and totally disabled—the Medical Board and the Trustees finally so found. But the fact that the Medical Board ignored for so many years the voluminous and compelling evidence that Cartagena was disabled is telling—for whatever its motivations, the Medical Board was strongly opposed to Cartagena's claims.[8]

The question now is whether the record contains "any credible evidence of lack of causation," that is, any credible evidence that Cartagena's disability was not "the natural and proximate result of a service-related accident." I conclude that the record does not contain any such credible evidence, and that, indeed, the record shows as a matter of law that Cartagena's disability was caused by her line-of-duty injuries on February 23, 1987, when she fell chasing a robbery suspect, and November 1, 1989, when she hurt herself pushing open a door while investigating a tripped alarm at police headquarters.

First, there is nothing in the record to suggest that Cartagena suffered from any pre-existing conditions or injuries. Indeed, Cartagena was appointed—and qualified to be—a police officer in 1984. There were no symptoms until after she fell in the first service-related accident. There is nothing in the record to suggest that Cartagena's subsequent condition was degenerative or arthritic or related to lack of bone

---

8. It is baffling, for example, that in 1998 the NYPD required Cartagena in her condition to try to fire 50 rounds in her condition and to thereafter bring her up on disciplinary charges for failing to qualify with a firearm. (PX CC at 8; PX QQ; Pet. Br. at 15–16).

density.[9] Nor is there anything in the record to suggest that any treating or consulting physician was of the view that Cartagena's condition was *not* work-related.[10]

Second, the record contains substantial evidence to show that Cartagena's disability *was* service-related. In addition to the chronology, there are numerous medical opinions to this effect. Dr. Monsanto, who treated Cartagena for many years, wrote in 1996 that Cartagena "has multiple medical problems and I believe they are all related to her accident at work." (PX U at 249). Dr. Zackin, who also treated Cartagena for many years, wrote in 2002 that her "disability appears to be directly related to her LOD injury of 2–23–87." (PX MM). Likewise, Dr. Greenwald, the professor of medicine at Albert Einstein College of Medicine, opined that Cartagena's "putative atypical circulatory problems are post-traumatic in origin." (PX PP). Other doctors, including the Trustees' own Medical Consultant, concurred.[11] In addition, Cartagena's surgeries were paid for by the police department as they were considered to be for line-of-duty injuries. (Pet. Br. at 20).

Finally, the Medical Board's ultimate diagnosis of "Raynaud's Syndrome Both Hands" (PX OO), which was accepted by the Trustees without any discussion or evaluation on the record (DX 48), simply does not answer the question of causation.

As the record makes clear, Raynaud's syndrome can be idiopathic, *i.e.*, arising spontaneously or from an unknown cause, or secondary, *i.e.*, caused by another condition, such as carpal tunnel syndrome, or an injury or trauma. (*See* DX 45; PXs MM, PP; *see also* PXs II, KK). The Medical Board concluded that Cartagena suffered from "Raynaud's Syndrome," but it did not explicitly discuss the cause of the symptoms and whether they were idiopathic or secondary. Hence, the Medical Board's conclusion that her disability was not service-related is difficult to understand, particularly in view of the cumulative evidence of the traumatic origin of the symptoms— the line-of duty injuries, the symptoms of hand dysfunction, the early and repeated diagnoses of carpal tunnel syndrome (or other injuries and conditions), the surgeries, and the opinions of the various treating and examining doctors, including Dr. Thomas, the Trustees' own Medical Consultant.

In their papers, defendants make two points that warrant discussion. The first is that the Medical Board's conclusion that Cartagena's Raynaud's syndrome was not the result of traumatic injury was rationally based because carpal tunnel syndrome does not result from a single trauma but from repetitive injury. (Resp. Mem. at 19 (citing DX 46 at 2)). This argument is flawed, for several reasons. First, it is difficult to know precisely what the Medi-

---

9. To the contrary, a bone scan obtained in 2000 was normal. (*See* PX GG).

10. At worst, there was an observation that the cause was "not very clear." (*See* PX EE at 19 ("Surgery was not carried out until 7 years after the injury which suggests to me that the diagnosis and causal relationship [were] not very clear, even to her treating physicians.")).

11. *See, e.g.,* PX F at 1 ("Cartagena ... sustained injuries to her right thumb while in pursuit of a fugitive."); *id.* at 4 ("Cartagena

... became disabled on 2/23/87."); PX II (Cartagena "has been having increasing symptoms and recently has been diagnosed with Raynaud's Disease. It is my [opinion] that the Raynaud's [D]isease is the result of her work related injuries and will complicate her underlying problems. Therefore, I also believe that the Raynaud's Disease is work related."); DX 45 at 4 (Cartagena "has several reasons for having Raynaud's phenomenon, which includes carpal tunnel.... She has had trauma....").

cal Board was thinking, because it did not explicitly conclude that Cartagena's Raynaud's syndrome was *not* caused by trauma, and it did not make any findings as to the cause of the Raynaud's syndrome. It only suggested that Cartagena never had carpal tunnel syndrome. Second, even if it were true that Cartagena did not have carpal tunnel syndrome, that would not mean that Cartagena's Raynaud's syndrome was necessarily idiopathic and not secondary. Clearly, Cartagena had a serious circulatory problem. The problem was difficult to diagnose and treat, but she had symptoms and underwent surgeries and even the Medical Board recognized in the end that Cartagena was permanently and totally disabled. Third, the record contains substantial evidence to the effect that Cartagena's Raynaud's syndrome *was* secondary to trauma. The Medical Board offered no explanation for the cause of the Raynaud's syndrome, and it made no effort to specifically rebut this substantial evidence.

The second point made by defendants that warrants discussion is the argument that the Medical Board physically examined Cartagena on many occasions, made its own findings, and repeatedly concluded that Cartagena's disability was not service-related. Defendants argue that the Medical Board was entitled to rely on its own expertise. (Resp. Mem. at 19–20). Although the Medical Board is entitled to rely on its own medical expertise to resolve conflicts in the record, its conclusions still must be based on credible evidence. The Medical Board's unsupported findings and conclusions, by themselves, do not constitute credible evidence of the lack of causation. In fact, the Medical Board repeatedly stated that Cartagena was not disabled at all, and then finally reversed itself, years later. As to causation, the Medical Board simply did not adequately explain its conclusion that the disability

was not service-related, nor did it make any effort to reconcile its conclusion with the significant evidence that showed that Cartagena's disability was service-related. The Medical Board's *ipse dixit* assertions do not, by themselves, constitute credible evidence.

The Medical Board's determination that Cartagena's disability was not service-related is not supported by any credible evidence, and is instead based on mere conjecture and unsupported suspicion. There is no genuine conflict in the evidence. Accordingly, I conclude that the record shows as a matter of law that Cartagena's disability is the natural and proximate result of her line-of-duty injuries on February 23, 1987 and November 1, 1989. *See Cusick v. Kerik*, 305 A.D.2d 247, 760 N.Y.S.2d 149 (1st Dep't 2003) (vacating Trustees' denial of ADR and awarding ADR, where record showed as matter of law that police officer's disability was natural and proximate result of service-related accident).

## CONCLUSION

For the reasons set forth above, the Article 78 petition is granted. Judgment will be entered declaring that Cartagena is entitled to ADR as a matter of law and directing defendants to award her ADR. Cartagena's counsel shall submit a proposed judgment on notice within five business days hereof.

SO ORDERED.